Filed 7/11/13 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of JULIE A. and GREG A. FICKE. | |
| JULIE A. FICKE, Appellant, v. GREG A. FICKE, Respondent. | G046263<br><br>(Super. Ct. No. 08D006901)<br><br>ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |

The opinion filed June 12, 2013 is hereby modified as follows:

At the end of the first paragraph on page 14 of the slip opinion, after the words "does not pass muster under section 4058, subdivision (b)." insert the following new footnote 10, and correspondingly renumber all subsequent footnotes. New footnote 10 should read: "The statute uses the phrase 'consistent with the best interests of the children.' Obviously, to reduce the amount of money a custodial parent receives will

never be "consistent with" the best interests of the children, *all else being equal*. Accordingly, imputation to a custodial parent requires some offsetting benefit to the children, which can often be found in the benefit of the noncustodial parent being able to spend more time with the children. Under the facts of this record, however, the trial court found no offsetting benefit to the children from imputation to their custodial parent. The only benefit the trial court identified, and that only obliquely, was to Greg."

This modification does not affect the judgment.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


THOMPSON, J.

Filed 6/12/13 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of JULIE A. and GREG A. FICKE. | |
| JULIE A. FICKE,<br><br>    Appellant,<br><br>      v.<br><br>GREG A. FICKE,<br><br>    Respondent. | G046263<br><br>(Super. Ct. No. 08D006901)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Ronald P. Kreber, Judge. Affirmed in part, reversed in part and remanded.

Law Offices of Marjorie G. Fuller, Marjorie G. Fuller and Lisa R. McCall for Appellant.

Masson & Fatini and Richard E. Masson for Respondent.

\*        \*        \*

INTRODUCTION

In this dissolution action, the trial court awarded custody of a couple's two teenage children to the mother 95 percent of the time. The court found the father makes $8,088 a month, including $4,112 net from two separate property rentals. The mother, by contrast, had an income of $251 a month from a start-up business. Ordinarily, in such circumstances, the father would pay much more than the $1,368 a month in child support he was ordered to pay. The reduction in child support, however, was effected by imputing $13,333 in monthly income to the mother. But the net support paid to the mother was then further reduced by the trial court's order to award spousal support to the father from the mother. The trial court entered an order making the mother pay the father $700 in spousal support. The total net support for the mother ended up at $668 a month.

The mother has appealed from these orders. We hold:

(1) As to child support, the trial court abused its discretion in imputing income to the mother without an express finding supported by substantial evidence that the imputation would benefit the children. (See *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 301-302; *In re Marriage of Mosley* (2008) 165 Cal.App.4th 1375, 1379-1380; *In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1051, fn. 3.) We do not say, of course, that a court may never impute income to a "custodial" parent, but we do say, as does the Family Code itself, that if it does so, any imputation must be supported by substantial evidence that the imputation is in the children's interest. (Fam. Code, § 4058, subd. (b).[1])

(2) As to spousal support, the trial court abused its discretion in making a spousal support award running from the mother under the particular circumstances of this case. The economic circumstances of the parties after the divorce did not support making the mother support the father. Specifically, the father has a hard money income of $8,088

---

[1]     All statutory references in this opinion will be to the Family Code.

a month while the mother's income is only $251 a month, and the father walked away from the divorce with somewhere around $1.7 million to $2 million in assets, while the mother wound up with assets of around $1 million. Independent of any imputation based on the mother's "earning capacity" is the simple fact that the father is self-supporting and doesn't need any additional help from the mother. The trial judge was duly impressed by the father's ability to support himself, noting his excellent skills, good assets, good employment, good health, and good career.

Accordingly, we reverse both the child and spousal support orders and remand both the child and spousal support issues for further proceedings consistent with this opinion. However, we affirm two other aspects of the judgment challenged on appeal. Both involve calculations of community and separate interests in discrete items of property (specifically, one of the noncustodial parent's two rental properties and the custodial parent's severance pay). The judgment is supported by substantial evidence as to each of those items.

BACKGROUND

Julie and Greg Ficke were married in spring 1993, and they separated in midsummer 2008, so the marriage lasted just a little more than 15 years. During that time they had two children, a boy and a girl, who, by the time of the judgment in November 2011, were 17 and 16 respectively.

At the time of the marriage, Julie worked for Beckman Instruments as a product planning manager for capillary electrophoresis and liquid chromatography equipment (to 1994), later as a marketing director for a manufacturer of sterilizers for surgical equipment (1994 to 2004). She then took a job as vice-president of marketing for a manufacturer of dental implants and other dental products in Yorba Linda. During her tenure with the dental implant manufacturer (2004 to 2008) she succeeded in doubling the company's total worldwide sales, and her final salary was about $200,000 annually, plus bonuses – and those bonuses, at least in the heady years of the mid-aughts,

could be very big indeed. Julie's 2007 W-2 from the dental implant manufacturer showed total compensation of just over $729,000. Even so, Julie was terminated in spring 2008. Her explanation to a vocational examiner was that a new CEO "came on board and wanted a male in the job." She received a severance package of 12 months base salary ($201,226), but was required, in return for the severance package, to sign an agreement giving up any civil rights claims she might have against the firm.

In the three months after her layoff, Julie conducted a job search which eventually yielded one offer: a marketing management job for a biotech company at $125,000. She declined that job because, when the offer arrived, she had already started a pet healthcare membership insurance program modeled after a similar business run by her mother in Arizona, *and* because the job would require considerable travel and not allow her to be home evenings with the two children. At least the start-up pet insurance business would allow her to do that.

The evidence is uncontroverted that Julie has worked full time at her pet insurance business since its inception, "probably working very hard" as the trial judge put it. The business, however, has not yet made any money; Julie has been living off loans from her mother and past savings. Thus, at the time of trial, Julie's hard money income was only $251 month. However, Greg presented evidence in the form of a vocational examination report that Julie was highly marketable and employable in the marketing end of various biotech industries, and could have (at least as of November 2010) found employment in marketing management in such industries at low, mid and high ranges of $120,000, $155,000, and $185,000 a year, respectively.

Meanwhile, Greg worked as a real estate broker for a large realty company (Cushman & Wakefield) and successfully ran for the city council of Aliso Viejo. He also received income from two rental properties. One was a house in Los Angeles called by the parties "Monte Mar," the other a condo in Redwood City called "Boardwalk." The judgment confirmed both Monte Mar and Boardwalk as Greg's separate properties, but

4

found there was a community interest in Boardwalk valued at $231,500, because in 2003 community funds were used to pay off the remaining mortgage balance.

Greg's total monthly income at the time of trial was found to be $8,088. That $8,088 consists of $483 from Greg's pay as a city council member of the City of Aliso Viejo, a monthly net average of $3,493 from Cushman and Wakefield, net rental income of $2,701 from Monte Mar and net rental income of $1,411 from Boardwalk. The $8,088 figure is not challenged by either party in this appeal.

Since Monte Mar is Greg's separate property and Boardwalk is about half separate property, there is no question Greg came away with far more assets after the divorce than Julie. The total net community property divided was valued at about $2.1 million, with each spouse receiving about $1 million in the division of community assets. But of course on top of the $1 million Greg also would end up possessing all of the equity in Monte Mar, because it was completely his separate property, plus his separate interest in Boardwalk. As to the value of these separate interests – the only valuation that appears in the record is one Greg himself put on it, in a schedule of assets filed in October 2008 that showed Monte Mar having a fair market value of $1 million, without any encumbrance. (We hasten to add that fair market value in October 2008, just as the great recession was getting started, is obviously not necessarily representative of fair market value by the time of trial over the course of 2010 and 2011. But even so, it is almost impossible to imagine, given Monte Mar's large net rental income at the time of trial that its fair market value is anything less than $500,000.[2]) In addition, Greg's separate property component in Boardwalk was found to be worth $201,500.[3] Thus it is safe to say that in the aftermath of the divorce Greg had over $1.7 million in assets, and perhaps

---

[2]      The evidence at trial showed Monte Mar was netting $2,701 to Greg. That pencils out to $32,412 a year. An investor looking for 4 percent return – great by today's standards – could pay $800,000 for the property and still have a little left over. And even an investor who desired a return of 6 percent would still consider Monte Mar a bargain at $500,000.

[3]      The court found the community interest in Boardwalk to be $231,500, using figures from Julie's forensic accountant. That calculation, in turn, placed a fair market value on the property of $433,000.

closer to $2 million given his own initial valuation of Monte Mar – that is, somewhere between 50 percent more and about double what Julie had.[4]  Greg also received the family home (net equity $455,465) despite the children's living elsewhere in a rented townhome with Julie.

Julie received her half of the community property mostly in the form of liquid or monetary assets while Greg received the family home.  Highlights of Julie's assets included some $98,000 in Johnson & Johnson stock, $381,000 in a Charles Schwab account, and another $375,000 in pension and retirement assets.  But Greg did not do too poorly by way of liquid assets either.  His total included about $233,000 in stocks and bonds, almost $19,000 in savings accounts, and $49,000 in pension and retirement funds.

The couple, during the good years of their marriage, had employed a nanny.  That ended with their separation.  While the initial custody arrangement had been 50/50, sometime afterwards the children made it clear they wanted to be with their mother.  Greg does not challenge the fact the court awarded Julie physical custody of the children 95 percent of the time, a fact which certainly undermines any idea he should be getting support from mother.

To read the trial judge's statement of decision after trial, one would think that much of it was laying the foundation for a spousal support award *for Julie from Greg*.  The description of Greg is downright glowing about his prospects:  Greg "has excellent skills . . . owns two houses, and . . . does not have periods of unemployment."  His "assets . . . are good."  He "has good employment, and he has income from three sources."  His age is "good."  He has "good health" and a "good career[]."  His is "self-sufficient" and "would remain so."

---

4        And that's assuming a lowball value of $500,000 on Monte Mar (i.e., an investor seeking a 6 percent return).  The actual calculations used by the trial court and incorporated into the judgment, sans Monte Mar, showed Greg receiving $1,129,667, while Julie received $1,019,030, hence an equalization of $55,319 from Greg to Julie.

Concomitantly, the statement of decision, while including Julie in the descriptions of having a good "age" good "health" and a "good career[]," and being "self-sufficient," expressed at least some negative perceptions of Julie's situation: "The ability of [Julie] to pay spousal support is not easy, because [Julie] is working in a start-up company and her earnings are down at this time."

Even so, the court imputed a whopping $13,333 a month income to Julie. The figure was based on the "income she would have earned had she taken the position that was offered to her."[5] The statement of decision justified the imputation by saying, without elaboration, that imputation was "a fair method to use for these calculations." In open court, when Julie's trial counsel challenged the imputation, the trial judge seemed apologetic about using "phantom" income but did not attempt to justify the imputation.[6]

Nowhere in the statement of decision or the trial judge's remarks do we find any reference to the interests of the children. And while the statement of decision goes through a number of the section 4320 factors from the Family Code, the tenor of the

---

[5]  Our review of the record reveals that the only job Julie actually turned down was the one with the marketing management job with the biotech company for $125,000, and Greg's respondent's brief certainly does not mention any other one. But $125,000 a year works out to less than $10,417 a month, not $13,333, and Julie's only hard income at the time of trial was $251 a month. The figure could possibly be justified by reference to the vocational examiner's report, which showed the mid range of marketing managers in the biotech field to be $155,000 ($12,917 a month) and the high range to be $185,000 ($15,417 a month), but that was not the basis given in the statement of decision.

[6]  Here's the totality of the remarks after the challenge. We pick up the dialog just after Julie's counsel had argued Julie "deserves" a "shot" at not "having to support a man who this court already says has three sources of income." The trial judge responded:

"The answer to that is no. I did have problems with the phantom income, and I went back and forth, weighed the factors, and that's where it's going to stand. And if I'm wrong, I'm wrong."

"But I do think that she has a lot of ability, and I know that [husband] has sources of – from three incomes, but I just think with the funds that are at [wife's] investment portfolio – the court did not go into that. The court thought that would be wrong to come up with some equation there. And normally when we impute a – an amount of money, we're usually imputing $1,387. That's the minimum wage. We're far beyond that in this case.

"But the lifestyle of the parties was with a nanny, and they're trying to give their children – both of them, both parents – are trying to give their children the best they can present to the children.

"So I know there's been probably a struggle in the working out of agreements here, but I think both people are probably pretty good parents. It's just that they have a different style of doing things."

The court then responded to Julie's trial counsel's point that Greg had no need for any spousal support. While the trial judge acknowledged that (obvious) point, he did not explain *why* some other consideration outweighed it; the discussion was now over: "I considered that also, and I gave that great weight. That will be the order . . . ."

trial judge's characterizations does not lead to the conclusion a lower-hard-money-income custodial parent should pay support to a self-sufficient noncustodial parent – with the exception of his "fairness" evaluation. Based on the judge's recitation of factors, one would naturally assume there'd be no spousal support, or, at most, a modest amount running from Greg to Julie, not the other way around. We quote that recitation in this footnote, to illustrate our difficulty in understanding his final order.[7]

Based on the imputation of monthly income of $13,584 to the custodial parent in light of the noncustodial parent's monthly income of $8,088 and a 95 percent

---

[7] Here is the entirety of the statement of decision's section 4320 discussion. Any ellipses are for matters that are different from the evaluation of the factors as such (e.g., how to calculate arrears). Readers should also note that, when it comes to section 4320, subdivision (*l*) – which in the statute states the legislative "goal that the supported party shall be self-supporting" – is glossed over so as to avoid confrontation with that express goal. We reproduce verbatim, including the irregular number and letter headings:

"4320 factors
"1. Respondent has excellent skills He is on the City Council in Orange Co City. Long time employment; own 2 houses free and clear.
"2. Respondent does not have periods of unemployment.
"B. this issue does not apply, Respondent did not help petitioner with her career.
"C the Ability of petitioner to pay spousal support, it is not easy because she is working in a startup company. Her earnings are down at this time.
"d. The standard of living will continue
"E. assets by supported person are good. He had two homes free and clear.
"F. this is a long term marriage.
"G. supported person has good employment; he has income from 3 sources.
"h. The age of the parties is good both in good health and great career ahead for each of them.
"I. domestic violence, the court will not consider as the charge was dropped by agreement.
"J No tax issue
"There should be no hardship for either party.
"L. each party is self sufficient and will remain so.
"m. No conviction.
"n. Other factors: This was a family living a very high life style and it will continue as both parties are motivated to continue this life style. The court would order that petitioner is to pay spousal support to respondent the amount of $700 per month and this amount is to be paid on the 15th of the month and to begin on June 14th 2011 and every month thereafter or until one party dies or there is a change by operation of law. This amount of support that respondent receives would place his income near $9000 a month. This would include his City Council amount, his rent from his two houses and his employment. The spousal award arrears to begin at the time the OSC was filed and petitioner to pay an added amount of $500 to be paid every month until the complete arrears sum is paid in full. This amount will also include an interest of 10% on the arrears.
". . . .
"Also the court adopted the assessment of the total community value of 874 Boardwalk Place, Redwood City, Ca to be $231,650
". . . .
"The court had difficulty in using a phantom amount of income for petitioner as she is working and probably working very hard. It is not like she was offered a high paying position and turned it down and would not work, but the court found this to be a fair method that was used in these calculations."

time share factor, child support was figured at $1,368 a month. However, in light of the trial court's imputation of – to use its own word – "*phantom*" income to the custodial parent of $13,333, the trial court imposed a spousal support award of $700 a month in favor of the noncustodial parent. The difference between the two meant that Greg would owe Julie, net, $668 a month.

DISCUSSION

A. *The Imputation of Income to the Custodial Parent*

There are very few – "a handful" overstates it – published appellate decisions which have upheld the imputation of income to custodial parents. (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 208-209; *In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331, 1339; *In re Marriage of Paulin* (1996) 46 Cal.App.4th 1378, 1384.) The reason is pretty obvious. Since the child support statutes expressly state the purpose of California's guideline child support system is to "place the interests of children as the state's top priority," (§ 4053, subd. (e)), it is counterintuitive – often counterproductive – to impute income to a custodial parent, because the objective effect of such an imputation will be to reduce the money otherwise available for the support of any minor children. Accordingly, the court in *Cheriton* observed that no imputation of income should be made to a custodial parent unless it benefited the children. Said the *Cheriton* court: "But no authority permits a court to impute earning capacity to a parent unless doing so is in the best interest of the children. By explicit statutory direction, the court's determination of earning capacity must be 'consistent with the best interest of the children.' (§ 4058, subd. (b).)" (Italics added.) (*Cheriton, supra*, 92 Cal.App.4th at p. 301.) The *Cheriton* court rejected a noncustodial parent's argument on appeal that it was an abuse of discretion for the trial court *not* to impute income to the custodial spouse.

Two opinions subsequent to *Cheriton* have read it to require a finding that any imputation be in the best interests of children. (See *Mosley, supra,* 165 Cal.App.4th

9

at p. 1389; *Cryer, supra,* 198 Cal.App.4th at p. 1051, fn. 3.)  We follow suit and also so hold.  Significantly, two of the three existing published cases upholding imputation to a custodial parent, *LaBass* and *Paulin*, were pre-*Cheriton*, and did not have the benefit of *Cheriton's* recognition that section 4058, subdivision (b) limits a trial court's power to impute income to custodial parents.  *Cheriton* itself noted that neither *LaBass* nor *Paulin* justified imputation in terms of the best interests of the children.[8]

The third published case to allow imputed income to the custodial parent, *In re Marriage of Ackerman, supra,* 146 Cal.App.4th at page 211, involved an express finding the imputation of income *was* in the best interests of the children, plus the imputation was comparatively modest under the circumstances.  It was *not* predicated on the idea the custodial parent should have been out earning income, but merely imputed a rate of return on certain assets.  (See *id*. at pp. 210-211.)  Moreover, the diminution in money payable as child support to the custodial parent in *Ackerman* obviously could have no effect on the children's actual support.  It only made a difference, as this court quoted the trial court as noting, whether the custodial parent would be able to continue to employ "'two nannies, a cook, and a couple of babysitters,' as well as a personal assistant." (*Id*. at pp. 208-209.)

For our part, we observe that *Paulin* can be described as imputation lite.  It was essentially a hardship modification case, where the noncustodial parent sought a downward modification based on the birth of twins to his present wife.  The custodial parent had quit a stressful nursing position and didn't show up for the modification

---

[8]     See *Cheriton, supra*, 92 Cal.App.4th at page 302, footnote 19:  In "*In re Marriage of LaBass & Munsee, supra*, 56 Cal.App.4th at page 1334, the trial court granted the father a modification, which decreased his child support obligation from $567 to $342 per month as a result of imputing income to the mother.  The Court of Appeal affirmed, without discussing how the decrease in support was in the best interests of the children.  Similarly, in *In re Marriage of Paulin, supra*, 46 Cal.App.4th at pages 1384-1385, the court reduced the father's child support obligation, after allowing the father a hardship deduction and imputing income to the unemployed mother based on the salary she had previously earned.  *Again, however, there was no explanation of how the reduced support payment was in the best interests of the children*." (Italics added.)

hearing.  Income was imputed to her based on her previous nursing position, but that imputation was expressly without prejudice to her coming back to court and proving her abandonment of the nursing job was "justifiable."  (*Paulin, supra*, 46 Cal.App.4th at p. 1384.)  The *Paulin* court's main point, emphasized in a footnote, is that the trial court simply *had* to have some equitable discretion to prevent a custodial parent from *unilaterally shifting* the burden of child support to the noncustodial parent – and we agree that is an excellent equitable principle – but the case did not confront the problem of children facing objectively reduced support.  (See *Paulin, supra*, 46 Cal.App.4th at p. 1385, fn. 5.)

       *LaBass*, on the other hand, was a case where the trial and appellate courts were very much unimpressed by the custodial parent's dilettantism.  When the couple divorced, the parties expressly contemplated the custodial parent's right to move out of the area "for employment purposes" – or to pursue a Ph.D in English literature.  (She already had her master's degree.)  (*LaBass, supra*, 56 Cal.App.4th at p. 1335.)  But she didn't pursue her Ph.D., instead opting to get yet another master's degree – this one in fine arts – and taking "occasional" part-time teaching jobs at community colleges.  (*Ibid*.)  Besides expecting the noncustodial parent to subsidize her perpetual studenthood, the custodial parent in *LaBass* was downright vindictive in her attitude toward her ex-spouse.  At one point she said, "I don't have a job, I won't work, and so you're going to have to pay my attorney's fees no matter how costly they are."  (*Ibid*.)  Perhaps precisely because of the custodial parent's vindictiveness, there is a passage in *LaBass* in which the court minimized the benefit *the children* received from the extra time gained from the custodial parent's part-time work.[9]

---

    [9]    "While Catherine may choose to pursue her education and spend more time with her children she may not use this choice to avoid her obligation to contribute financially to their support, unless the court finds that such decision is in the best interests of the minor children.  (*In re Marriage of Ilas* (1993) 12 Cal.App.4th 1630, 1639.)"  (*LaBass, supra*, 56 Cal.App.4th at p. 1339.)

Let us simply say here that we do not share any inference that might be arguably extracted from the brief passage in *LaBass* to the effect that time spent with a parent is not, all else being equal, a good thing. Time spent with children is to be valued. First, there is a body of law that says so. (*In re Marriage of Everett* (1990) 220 Cal.App.3d 846, 862 ["The trial court's task is more delicate than simply deciding that because a parent might be able to earn more money, additional income should be imputed to that parent"]; *Mosley, supra,* 165 Cal.App.4th at p. 1390 [if the custodial parent "contributed to the support of the children" the noncustodial parent "would be able to spend more time with the children himself"]; *In re Marriage of Bardzik* (2010) 165 Cal.App.4th 1291, 1311 ["There may be times, however, when 'the best interests of the children' are promoted when parents leave stressful, time-consuming, albeit high paying jobs, so as to be able to spend more time with their children."]; *Wilson v. Shea* (2001) 87 Cal.App.4th 887, 895 [recognizing "the Legislature's announced public policy in favor of visitation with the noncustodial parent, the benefits of such contact noted in the social science research, and the detriment to the child's personality development that results from its lack"]; e.g., *In re Marriage of Lim and Carrasco* (2013) 214 Cal.App.4th 768, 777-778 [justification for upholding trial court determination to use income based on 80 percent work schedule included evidence "reduced work schedule would allow" attorney mother "more time to care for her young children"]; accord *In re Marriage of Simpson* (1992) 4 Cal.4th 225, 234-236 [importance of moderation in working hours].) Second, the Legislature itself has plainly placed a high value on time with children. (§ 3020, subd. (b) ["it is the public policy of this state to assure minor children frequent and continuing contact with both parents after the parents have separated"].) All that said, ironically enough, we think the *result* in *LaBass* was correct because the imputation there

---

It is significant to note that the authority cited, *Ilas, supra*, 12 Cal.App.4th 1630, did not involve a custodial parent at all. *Ilas* is a much more common example of a noncustodial parent who quits work and then seeks a modification downward in light of his or her new divested circumstances.

could easily have been justified as benefiting the children in that the payor parent needed the money to travel from Sacramento to Southern California for visitation.

More than a decade and about 100 volumes of the California Official Appellate Reports passed after *LaBass* before Justice Moore's insightful opinion in *Mosley, supra*, 165 Cal.App.4th 1375 recognized the best reason to take the otherwise counterintuitive course of imputing income to a custodial parent: *To allow the noncustodial parent to spend more time with the children*: "However, we agree with Paul's assertion that, here, the trial court did not consider all of the evidence before it in evaluating the best interests of the children. The court stated there was a 'total lack of evidence' that Dawn's returning to work would be in the children's best interests. However, Paul testified that if Dawn contributed to the support of the children, *he would not need to spend as much time at work trying to maximize his bonus and would be able to spend more time with the children himself*. We cannot disagree with his assertion that *it is in the best interests of the children to receive nurturing from both parents*. Indeed, sometimes 'the "best interests of the children" are *promoted* when parents [reduce their work hours] so as to be able to spend more time with their children.'" (*Mosley, supra,* 165 Cal.App.4th at p. 1390, quoting *In re Marriage of Bardzik, supra* 165 Cal.App.4th at p. 1311, first italics added.)

In the case before us now, however, there was no finding imputation would be in the children's best interests. Nor was there any finding Greg needs any monetary break to increase his visitation time. And in fact, what evidence there is all points to an affirmative detriment to the children resulting from imputation. First, obviously, imputation has the objective effect of making less money available for the children. Second, imputation under the circumstances of this case means giving the custodial parent an incentive to leave two teenagers alone on evenings and weekends. Here, Julie turned down the job with the biotech firm because she knew it would involve travel and lost evenings, which would be costs in time that she would not have to incur running a

13

nascent pet insurance firm.  The trial judge gave Julie an incentive to go back to the high pressure world of being a corporate marketing director, which would have meant less time with the children, particularly in the high learning curve early months of any new job.  While there might have been abstract justice in penalizing Julie for not putting her own time to its most *monetarily* efficient Gradgrindian use, there was – to use a monetary metaphor – no "percentage" in it for the children.  It did not prioritize the needs of the children, and therefore, with regard to *child support*, does not pass muster under section 4058, subdivision (b).

B. *Spousal Support to a Self-Supporting Spouse*

Child support is one thing, spousal support quite another.  (*In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1446, fn. 3 ["Child support and spousal support serve different purposes, implicate different policies, and are governed by different rules."]; *In re Marriage of Padilla* (1995) 38 Cal.App.4th 1212, 1218, fn. 2 ["different policy considerations" govern spousal support than child support].)

For one thing, the statutory basis for imputation of income to the payor litigant is different.  For child support, the basis for imputation is section 4058, subdivision (b), which hastens to the best interests of the children in the next breath.  By contrast, for spousal support, the basis for imputation is but one factor among many, embedded in a reference to "earning capacity" in subdivision (a) of section 4320, and that factor itself is quickly put into the context of possibly *impaired* earning capacity due to periods of unemployment during the marriage to devote time to "domestic duties." (§ 4320, subd. (a)(2).)

For another, while the child support guideline statutes reflect the explicitly high priority the Legislature has placed on the support of children (§ 4053, subd. (e)), there is, as commentators have noted, no one single legislative purpose behind spousal support.  (See Hogoboom & King, *supra*, ¶ 6:822, p. 6-302.5 ["Whereas child support awards facilitate a *uniform* purpose . . . *spousal support* necessarily serves varying

functions, depending on the parties and the underlying facts and circumstances."]; *In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 480 ["Some members of the bench and bar have been critical of the Legislature, contending it has failed to specify the purpose of spousal support. . . . The purposes of spousal support inevitably vary from case to case, depending upon the parties and the facts and circumstances of the case."].)

But a spousal support award cannot *undercut* the child support statutes. (See *Mosley, supra*, 165 Cal.App.4th at p. 1390 [rejecting argument that "impact on the children is utterly irrelevant in the spousal support context"]; *In re Marriage of Rosan* (1972) 24 Cal.App.3d 885, 899 [noting interrelation between child and spousal support].) We read statutes as part of a consistent whole, not in isolation. (E.g., *Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 530.) Implicit in the high priority given the best interests of the children in the *child* support statutes is the Legislature's intent there be no legerdemain on the spousal support side to take with one hand what the child support statutes give with the other.

Moreover, an examination of the spousal support statute, section 4320, shows it to be not just a mélange of factors, but an expression of several affirmative policy preferences. To be sure, one set of policy preferences, expressed in subdivisions (i) and (m) – which are aimed at criminal behavior and violence – has no application to the case before us. But others do. The most obvious appears to be in subdivision (*l*), which expresses the *goal* each party will be "self-supporting within a reasonable period of time." One can also detect policy preferences that seek to equitably account for the value of "domestic" work, even if it means the impairment of formal job market skills, in subdivisions (a)(1) [requirement to consider need for retraining] and (a)(2) [impairment by "periods of unemployment. . . incurred during the marriage . . . to devote time to domestic duties"]. The same policy preference also crops up in subdivision (b), recognizing the contribution of a homemaker spouse to the job skills of the supporting spouse.

By contrast, the Legislature has not expressed any preference that the "standard of living established during the marriage" be maintained for its own sake. The statute, in subdivision (d), uses the marital standard of living simply as a baseline for the "needs of each party."

Applying these considerations to the instant matter, we first note Greg has excellent skills, political connections, two houses free and clear, no periods of unemployment, good assets, good health, a great career, and is self-sufficient. By the trial court's own reckoning, Greg is pretty much the *last* divorcing spouse who should receive spousal support. Not only does the spousal support order cut against the express grain of subdivision (*l*) [Greg is already self-supporting], it is also impliedly inconsistent with subdivisions (d) [Greg has no need]; (e) [Greg has plenty of assets for his own support]; (g) [Greg has plenty of ability to engage in his own employment]; and (h) [Greg is in good health and is in the prime of life].) It is pretty clear from an examination of the totality of factors enumerated by the Legislature in section 4320 that spousal support was meant for ex-spouses like the one in *Rosan, supra*, 24 Cal.App.3d 885 [reversing support order as too low and too short in light of 17-year marriage during which supported spouse was not employed outside the home], not self-sufficient spouses like Greg.

Concomitantly, most of the factors that might arguably support a Julie-to-Greg support award are greatly attenuated: the marital standard of living (subdivision (d)) – obviously a high one – is not a desideratum in and of itself, and certainly cannot stand against the diminution of support for the children. The length of the marriage (subdivision (f)) was, at 15 years, one that typically involves some support, but that's when, as impliedly shown in subdivisions (a), (b), (c), (d), (e), (g) and (h), there's real inequality between the spouses, with the supported spouse being at an otherwise significantly lower level economically than the supporting spouse, not the other way around. And the only arguably strong factor supporting a Julie-to-Greg order, Julie's raw earning capacity, is itself undercut by the extra time the children receive from her

16

pursuing a humane work schedule. The record indicates Julie only makes the big bucks by working evenings and traveling. That is, the money comes at the cost of time with the children.

We do recognize, of course, that Julie's preference for a full-time job that actually allows her to be with the children on weeknights and weekends does, under *Paulin*, represent, to some degree, a unilateral shift of monetary child support costs from her to Greg. But unilateral shift theory is an equitable factor that might arguably, under the *child* support statutes (see § 4057, subd. (b)(5) [special circumstances make application of child support formula unjust]) allow Greg to get a break on his child support order. Nothing we say in this opinion is intended, on remand, to prevent Greg from making that argument in the context of child support. But it cannot, in light of the legislative priority given children, be the reason for a *spousal* support order undercutting a child support order. In sum, even tested on a traditional abuse-of-discretion review of a spousal support award, this support award is untenable.

C. *Miscellaneous Property Allocations*

1. *The Boardwalk House*

Julie's expert calculated the community interest in Greg's separate Boardwalk property two ways: In the first, he assumed the only community contribution was confined strictly to the amount used to pay off the mortgage in 2003. That approach meant the community's interest in Boardwalk was valued at $231,500. The other way, the expert assumed that all mortgage payments on the property made after marriage were also community. Under that approach the community's share was calculated at $379,112. While the judge used the actual calculations made by Julie's expert, he found true the assumption most favorable to Greg, namely that the only community contribution was the 2003 mortgage payoff. Hence, the community interest in Boardwalk was determined, as mentioned above, to be $231,500.

On appeal now, Julie argues the judge erred and should have used the assumption most favorable to her, i.e., that all mortgage payments after the marriage came from community property, so the proper number would have been $379,112. Her theory is that Greg was required to produce specific records (e.g., bank account statements) which would have shown the rents from Boardwalk were used to make the mortgage payments, and that absent such specific documentation, the court was necessarily required to assume the mortgage payments came from community property.

We disagree. The need for specific record tracing arises when there is a *commingled* account. As this court explained in *In re Marriage of Stoll* (1998) 63 Cal.App.4th 837, 841, the need for specific records, as it originated in the "granddaddy" case of *See v. See* (1966) 64 Cal.2d 778, is the product of two factors: (1) the combination of commingling of separate and community funds and (2) the general presumption that property acquired during marriage is community. A burden of recordkeeping logically arises out of the very act of commingling funds during marriage so the general community property presumption is not thwarted. (*Stoll, supra*, 63 Cal.App.4th at p. 841, citing and quoting *See, supra*, 64 Cal.2d at pp. 783-784.)

The need for specific records and documents to trace funds is thus predicated on the existence of a commingled account. *See*, and the two cases on which Julie mainly relies, *In re Marriage of Higinbotham* (1988) 203 Cal.App.3d 322 and *In re Marriage of Braud* (1996) 45 Cal.App.4th 797, all involved the undisputed existence of commingled accounts.[10]

---

[10]    In *See*, The husband had two accounts, into both of which he deposited his personal (community) earnings. (See *See, supra*, 64 Cal.4th at p. 782 [noting "personal account" and "Security Account" into which the husband deposited salary and earnings income].) In *Higinbotham*, the rents from a property that was acquired before marriage were paid into one of two community accounts. (*Higinbotham, supra*, 203 Cal.App.3d at p. 327.) And in *Braud*, a spouse claimed credit for $10,000, taken from his inheritance, allegedly used for improvements to the community house (e.g., for lumber purchases). His problem, a la *Higinbotham*, was that the $10,000 had been deposited into a community account – the account into which paychecks were deposited. (*Id*. at p. 822-824.)

18

In the case before us, however, there was substantial evidence there was never a commingled account in the first place. Greg purchased Boardwalk in 1991 – prior to the 1993 marriage. Greg testified all rents from the property were used to pay the mortgage, Boardwalk was rented 95 percent of the time, the rent itself was $1,200 a month, and that rent would have covered the mortgage, which was also about $1,200 a month. Greg testified he maintained the same separate account for both the Boardwalk *and* the Monte Mar property and that the combined income from both properties was around $3,600 to $3,800 a month. And it was undisputed that Monte Mar had no encumbrances, so the trial court could easily conclude there was a large surplus of separate property rents coming into Greg available for use on the Boardwalk mortgage payments.

There was some evidence from Julie to the contrary. She asserted (very generally) that the community made payments "to the mortgage" of Boardwalk going back to 1993. She conceded she didn't have any document to support that assertion.[11] And she did not identify, in her testimony, any commingled account into which separate property rents from Boardwalk and Monte Mar would have been combined with community earnings.

The evidence before the trial judge as to whether there was a commingled account from which mortgage payments had been made (e.g., an account into which both rents and salary had been deposited), or alternatively, a community account from which mortgage payments were made, was in conflict. Based on Greg's testimony alone, the trial court was perfectly entitled to believe Greg rather than Julie, and impliedly find there was no commingling or payments from a community account. (*In re Marriage of*

---

[11] There was also evidence the *couple* did not acknowledge any of the income from either the Boadwalk or Monte Mar rentals on their tax returns. Julie testified that part of the tax return was Greg's responsibility. The trial judge was tasked with deciding issues *between the couple*, not between the couple and IRS, so was not compelled to find the existence of community payments on a separate mortgage simply because of the nonexistence of rental income on tax returns.

*Mix* (1975) 14 Cal.3d 604, 614 [testimony of a single witness, even a party in a divorce case, may constitute substantial evidence of tracing]; *In re Marriage of Alexander* (1989) 212 Cal.App.3d 677, 682 ["notwithstanding Carolyn's contrary testimony, the court's finding of no extrinsic fraud was supported by substantial evidence, consisting of Patrick's testimony and declaration"].) The trial judge got it right; this was a case where the recordkeeping requirements found in *See*, *Higinbotham*, and *Braud* simply did not apply.

2. *The Severance Payment*

Julie received about $200,000 in severance pay from the dental implant maker in the last few months of the marriage, and the trial court held all the money constituted community property. On appeal, Julie argues roughly $170,000 of that severance package represented consideration for a non-compete agreement. She reasons that since the non-compete agreement represents her promise not to work against her erstwhile employer *after* marriage, i.e., represents compensation for her post-separation efforts (or more precisely, her forbearance of post-separation efforts), the trial court erred in characterizing the amount as community property. The answer to this is that the non-compete agreement applies only to the dental implant industry, and there was substantial evidence that Julie has plenty of experience in biotech areas outside of dental implants, including surgical sterilizers, capillary electrophoresis equipment, DNA sequencers, protein synthesizers and microbiology supplies. In short, the trial court could reasonably conclude that, given the breadth of Julie's experience, the value of the non-compete clause was de minimis in relation to the rest of the agreement. Moreover, given the evidence Julie may indeed have been terminated for a reason in violation of civil rights statutes, the trial court could also reasonably have concluded that most of the value of the severance package was in settlement of valuable anti-discrimination claims possessed by Julie which arose during the marriage. Again, we find the court's conclusions unassailable.

## DISPOSITION

The child and spousal support orders are reversed, and those issues are remanded to the trial court for further proceedings consistent with this opinion.  The judgment is otherwise affirmed.  Though this is technically a split decision in terms of issues raised on appeal, on balance the child and spousal support issues far outweigh the two property issues in terms of both public and personal import.  Therefore we conclude that Julie is the prevailing party and should receive her costs on appeal.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


THOMPSON, J.

21