Filed 4/29/14  Marriage of Charlebois CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of DIANE and ERIC CHARLEBOIS. | D064246 |
| DIANE CHARLEBOIS, | |
| Respondent, | (Super. Ct. No. ED77080) |
| v. | |
| ERIC CHARLEBOIS, | |
| Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Steven E. Stone, Judge.  Affirmed.

Dawn M. Dell'Acqua for Appellant.

Patrick L. McCrary and Larry Dale Kincaid for Respondent.

Eric Charlebois (Father) appeals from an order modifying his spousal and child support obligations with his former spouse, Diane Charlebois (Mother).  He argues the

court erred in imputing $6,500 in monthly income to him after his business failed. We conclude the court did not abuse its discretion and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Mother and Father were married in March 1995. They have two minor sons, one born in 1998 and one born in 2003. During the marriage, Mother and Father acquired several properties, including two residences in Ramona. In 2007, one of the residences was destroyed in the "Witch Creek" fire. In February 2009, the couple separated.

Ten months later, in December 2009, the court entered a dissolution judgment based on the parties' marital settlement agreement. In the settlement agreement, the parties agreed to a division of their real and personal property. The parties also agreed to joint legal and physical custody (50/50) of their minor children in a "week-on-week-off" arrangement. The agreement established child support based on the following facts: (1) Father's gross monthly income of $7,125; (2) zero income for Mother until May 2010 when her income would be imputed at minimum wage for a total of $1,425 per month; and (3) each party filing head of household plus two dependents and a 50 percent timeshare for each party. Based on these figures, Father was ordered to pay $1,865 in monthly child support until May 2010, when the payments would decrease to $1,275. The agreement also established monthly spousal support at $775 until May 2010 when the payments would increase to $963.

About two years later, in March 2012, Father moved to modify the orders. Father sought a downward adjustment of spousal and child support based on the recent closure of his used car dealership business. He said: "I am currently unemployed and have

2

applied for unemployment. I will be looking to get retrained in another field." While the motion was pending, in July 2012, Father filed a Chapter 7 bankruptcy petition, seeking to discharge his personal and business debts.

In opposing Father's modification request, Mother argued that Father did not meet his burden to show changed circumstances, including a lack of ability and opportunity to earn the same income. Mother claimed that Father voluntarily closed his business to avoid paying support payments and had not made any attempts to obtain new employment or otherwise earn income.

A hearing on the support issues was held on February 27, 2013 and March 6, 2013.[1] At the outset, Father's attorney agreed that Father had the burden of proof at the hearing. During the hearing, Father testified he had previously worked at his father's used car business in sales and financing for 22 years. His earnings were commission-based and during the later years reached $80,000 to $90,000 per year. In late 2007, Father purchased his father's business for about $250,000, and thereafter paid himself about $7,000 per month in his new business. He also began a related business (Group One Auto Finance, LLC) that would finance customer purchases, but he earned only a minimal amount from this business.

In about January 2012, Father determined that he needed to close his used car business because of declining sales, credit line problems and increasing debts. He

---

[1]     The court had previously held a hearing on issues raised in Father's motion that are not directly relevant here. Because the appellate record does not include the earlier hearing, we do not discuss these matters in this opinion.

3

terminated the business at the end of February 2012. Several months later, he filed for personal bankruptcy, and identified about $2.4 million in debt. Many of those debts were (or will be) discharged in bankruptcy.

Father testified that shortly after he closed his business he began "putting feelers out" regarding jobs. However, he did not actively begin looking for work until about six months later (in September 2012) because he was busy winding down his business and responding to a state franchise board audit. Father said he filed online applications for unspecified automobile sales positions, but when asked for proof, he admitted he did not bring any supporting documentation to court. Father said most new car dealerships require a college degree for a sales position, which he does not have. Father said he ultimately decided not to pursue an automobile-related job because he believed he was either overqualified or underqualified to work in the automobile industry.

Father said he instead decided to pursue real estate and obtained his real estate license in or about February 2013. Regarding his job search in the real estate field, Father said he "contacted [a] broker friend of mine and contacted . . . another friend of ours who works for Diamond Resorts [a time share organization]. She verbally offered me a job pending HR approval." Father said he is still waiting to hear whether he will be offered the job. He said that Diamond Resorts pays minimum wage of $8 per hour and "[t]here is commission built up over time," but he did not know the commission structure. Father said he also contacted one or two other real estate brokerage entities, but they pay only commission and therefore he did not want to pursue those jobs.

4

Father testified his current income is $450 per week from unemployment insurance, plus $216 per month from his Group One finance business. His current monthly expenses are $5,240. Father's fiancée lives with him, and she helps him pay the bills and the mortgage. He also testified about various properties he owns, all of which he said are encumbered by deeds of trust that are more than the property is worth.

At the end of Father's testimony, the court offered preliminary comments to assist the parties in presenting the remaining portions of the case. Of relevance here, the court stated that based on Father's testimony, it appeared Father "can make a lot more money than he's currently making, and that he might be unwilling, at this time, to be making the amount that he can make." Based on that view, the court said it was inclined to impute income to Father: "I'll note that one thing he did, he did pay himself $7,000 per month at his old job. And I'm not saying that's the number I would choose, but it's a number up to that number in terms of the amount that I might impute to him. Could be more; could be less. It depends upon the argument and additional testimony."

Mother then testified. Mother is 41 years old and left school during ninth grade. She said she suffers from various medical problems, including a herniated disk and severe migraines. Mother testified that she lives on property that currently has no built home (because it was destroyed in the Witch Creek fire), and she stays in a "toy hauler" (a type of recreational vehicle trailer) with her boyfriend and Mother/Father's two sons. Mother said she received funds from an insurer and from a third party settlement pertaining to the fire, and she plans to build a small home on the property with this settlement money. Mother said that she works approximately 10 hours per week at $15

5

per hour, but that she was not contesting an imputation of income equivalent to full-time minimum wage.

Mother also testified regarding Father's prior involvement in real estate development and purchases, including that he took one year off from working for his father to engage in real estate development projects. Mother said that Father has many friends and contacts in the automobile industry, and that Father's father has since opened a new automobile sales business and she does not believe Father has sought to work in that business.

During cross-examination of Mother, Father's counsel sought to elicit Mother's testimony regarding whether she could be making more than minimum wage, whether she was being supported by a live-in boyfriend, and facts regarding her standard of living.

At the conclusion of the evidence, Father's counsel urged the court not to impute any income to Father, other than a minimum wage. In support, he emphasized the evidence showing Father did not voluntarily close his business and that the Diamond Resorts sales position pays only $8 per hour. Father's counsel also argued that Mother had the burden to produce evidence regarding any income imputation amount imposed on Father, and devoted a substantial portion of his argument to assert that Mother was manipulating her income and was not making reasonable efforts to find a job above minimum wage. He asserted that "all of the assets from the marriage are on [Mother's] side of the table" and that Father has "very limited job prospects." He asked that the court terminate spousal support, and claimed "the equities in this case would be that

6

[Father] . . . deserves the same minimum wage imputation because that's [the only] job he can get. There's no evidence of anything else."

Mother's counsel countered that it was Father's burden to prove the lack of ability and opportunity to earn income, citing *In re Marriage of Bardzik* (2008) 165 Cal.App.4th 1291 (*Bardzik*)). Under this standard, Mother's counsel urged the court to impute an income to Father based on Father's prior earnings. Mother's counsel argued that the facts showed Father did not make any reasonable efforts to seek reemployment or earn an income and that Father had intentionally closed his business to avoid support obligations.

After considering the evidence and arguments, the court rejected Mother's argument that Father had voluntarily closed his business for improper reasons. But the court found Father had the full ability and opportunity to find and work in a different job, and had "made almost no effort at all to seek employment." The court stated that Father demonstrated a complete lack of "willingness" to earn more than a minimum wage. The court also noted that Father had been in the "automotive car sale industry for over 20 years" and had most recently paid himself $7,000 per month.

Based on these findings, the court found Father established a material change in circumstances (the loss of his business), but Father failed to present sufficient grounds supporting a substantial downward modification of his spousal or child support obligations. Viewing the totality of the circumstances, the court found it appropriate to impute a $6,500 monthly income to Father, stating that "I do believe he could find employment that pays him the $6,500 per month." The court indicated that Father's prior income level was some evidence of Father's value in the employment marketplace. With

7

respect to spousal support, the court additionally emphasized that it had considered "all of" the Family Code section 4320 factors and had "balanced the hardships to each party here." Based on the imputed income amount, the court ordered Father to pay a reduced $1,067 amount in monthly child support and a reduced $850 amount in monthly spousal support.

After calculating the child support amounts, the court asked: "Anybody have any other comments on that?" Father's counsel replied: "Well, Your Honor, the only comment that I have is, the Court imputed a rather hefty figure to [Father], *and I anticipate that he's going to be making diligent job search efforts to locate a job*, and that, you know, *actual evidence*, we have the right to reintroduce that *actual evidence* to the Court imputing now." (Italics added.) The court responded: "I hear you, but I'm basing this off of a very long evidentiary hearing, set for two hours. We've gone more than four hours on it, and there was extensive pleadings in this case as well. [¶] So that will be the order for child support. The prior child support, I understand it was $1,265, so it is a reduction from what was there before."

Father appeals.

### DISCUSSION

#### I. *Governing Legal Principles*

A child support order "may be modified or terminated at any time as the court determines to be necessary." (Fam. Code, § 3651, subd. (a).) If the parties stipulated to an initial child support order consistent with the statewide uniform guidelines, to prevail on a motion seeking a downward adjustment, the supporting spouse must introduce

8

admissible evidence of a material change of circumstances. (See *In re Marriage of Bodo* (2011) 198 Cal.App.4th 373, 386-392; *In re Marriage of Laudeman* (2001) 92 Cal.App.4th 1009, 1015; *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 298 (*Cheriton*).) When a party seeks to modify spousal support, the party must likewise proffer admissible evidence of a material change of factual circumstances. (*In re Marriage of Dietz* (2009) 176 Cal.App.4th 387, 398; *In re Marriage of Tydlaska* (2003) 114 Cal.App.4th 572, 575.)

If the payor spouse seeks a reduction in spousal and/or child support based on a job loss, courts frequently invoke income imputation rules to determine whether there has been a change of circumstances. (See Fam. Code, § 4058, subd. (b)[2]; *Bardzik, supra*, 165 Cal.App.4th at pp. 1299-1308; *In re Marriage of Eggers* (2005) 131 Cal.App.4th 695, 699-701 (*Eggers*).) Under these rules, the court examines whether the spouse has the ability and opportunity to earn the same level of income as before the job loss. (See *Eggers, supra*, 131 Cal.App.4th at p. 701; see also *Bardzik, supra*, 165 Cal.App.4th at pp. 1302, 1304.) The relevant focus is on the party's *earning capacity*, which "represents the income the spouse is reasonably capable of earning based upon the spouse's age, health, education, marketable skills, employment history, and the availability of employment opportunities." (*In re Marriage of Simpson* (1992) 4 Cal.4th 225, 234; see *In re Marriage of Paulin* (1996) 46 Cal.App.4th 1378, 1383.) This requires an analysis of

---

[2]    Family Code section 4058, subdivision (b) states "The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interest of the children."

whether the spouse has the *ability and opportunity* to earn the prior income. (*Bardzik,*

*supra*, 165 Cal.App.4th at p. 1302; see *In re Marriage of LaBass & Munsee* (1997) 56

Cal.App.4th 1331, 1337-1338.)

When a payor spouse seeks to reduce his or her payments, this spouse has the

burden to establish with admissible evidence the lack of ability or opportunity to earn the

same income, i.e., that despite reasonable efforts, he or she could not secure employment

with a similar income level. (*Eggers, supra*, 131 Cal.App.4th at p. 701; see *Bardzik,*

*supra*, 165 Cal.App.4th at pp. 1303-1304, 1308; *In re Marriage of Leonard* (2004) 119

Cal.App.4th 546, 556.) The payor spouse must present facts showing he or she either

lacked the ability to work at a similar pay level or had no reasonable opportunities to

obtain this employment.

Under these rules, the court may impute income to the supporting spouse

regardless whether he or she left the job voluntarily or was terminated for misconduct.

(See *Eggers, supra*, 131 Cal.App.4th at pp. 700-702; see also *In re Marriage of Hinman*

(1997) 55 Cal.App.4th 988, 998-999.) Although the reason for the job loss may be a

relevant and an important factor in the analysis, it is not necessarily the controlling factor.

Instead, the court should determine the supporting spouse's earning capacity based on an

evaluation of the totality of the circumstances. (See *Eggers, supra*, 131 Cal.App.4th at p.

701; *In re Marriage of Stephenson* (1995) 39 Cal.App.4th 71, 81.)

A court has broad discretion in determining whether the changed circumstances

warrant a modification. (See *In re Marriage of Williams* (2007) 150 Cal.App.4th 1221,

1233-1234; *In re Marriage of Terry* (2000) 80 Cal.App.4th 921, 928.) On appeal, we

consider whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion. (*In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 730.) Absent an abuse of discretion, we must uphold the trial court's order even if we would have reached a different factual conclusion. (*Ibid.*; see *In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 47.) We must affirm unless there was a manifest abuse of discretion and the error was prejudicial. (*In re Marriage of Leonard, supra*, 119 Cal.App.4th at p. 555.)

## II. *Analysis*

Viewing the evidence in the light most favorable to the court's order, the record supports the court's conclusion that income imputation was appropriate in this case. The record shows Father, aged 43, was a highly experienced used car salesperson, had training and experience in automobile financing, and had been involved in several real property transactions and residential development projects. Shortly after he closed his business in February 2012, Father moved to modify his support payments. But the hearing did not take place for another year. During that time, Father took no meaningful steps to find a replacement job. The evidence shows that Father had numerous contacts in the automobile sales field and his father had reopened his sales business. However, after making minimal effort to find a job in this industry, Father decided he was either overqualified or underqualified for this work.

Father then decided to change his career and obtained a real estate license, but a parent does not have the right to divest himself of his earning ability in an existing career at the expense of his children. (See *In re Marriage of LaBass & Munsee, supra*, 56

11

Cal.App.4th at p. 1339; *In re Marriage of Ilas* (1993) 12 Cal.App.4th 1630, 1637-1639.) In any event, Father did not show that he made any efforts to earn a comparable income in the real estate field. Instead, he spoke with two friends, one of whom said she could help him obtain a minimum wage job selling time-share vacation units. Father was unaware of the commissions that could be earned in this job or when he would be actually offered this job.

Based on the evidence before it, the court found Father had made no reasonable efforts to use his training, experience, and talents to obtain an income that was similar to his prior income. The court did not find credible Father's assertions that he could not find a job in the automobile industry, and/or that he would be limited to a minimum wage job in the real estate profession. The court further found Father had the ability to obtain a job at a wage that was close to his prior income. On this record, the court had a reasonable basis to reject Father's argument that his income for purposes of support payments should be reduced to a minimum wage figure.

On appeal, Father faults the court for selecting the $6,500 figure, arguing there was no *specific* evidence showing this was the amount he could earn in a new job, i.e., although he may have had the *ability* to earn this amount, there was no evidence he had the *opportunity* to obtain a job with this income level. However, Father ignores that it was his burden to show he could not continue to earn a similar income. (See *Bardzik, supra*, 165 Cal.App.4th at pp. 1304, 1308; *Eggers, supra*, 131 Cal.App.4th at p. 701.) Father concedes in his appellate brief that as the spouse seeking the modification based on his failed business, he had the "burden to prove 'sufficient facts' to establish *lack of*

12

*ability and opportunity to earn income*."  By failing to produce credible evidence that he

lacked the ability or opportunity to earn a comparable income, Father cannot fairly

complain that the court selected the wrong level of income imputation.  Moreover, the

record showed that Father had earned a $7,000-plus monthly income selling used cars for

a lengthy period, and had previously earned an $80,000 to $90,000 annual salary based

solely on sales commissions.  On this record, the court had a reasonable basis to conclude

that if Father had made reasonable efforts, he could and would have found a job that

would pay him at least $6,500 in monthly wages.

Shortly after Father testified, the court notified the parties that it had tentatively

found Father's testimony supported an income imputation and gave Father the full

opportunity to present evidence showing a reasonable imputation amount.  However,

Father presented no further evidence on this subject other than to argue for a minimum

wage imputation.  After the presentation of the evidence and the court stated it intended

to impute the $6,500 monthly amount, Father's counsel responded that he "anticipate[d]"

that Father is *now* "going to be making diligent job search efforts to locate a job" and

asked for the "right to reintroduce that *actual evidence*" to the court.  (Italics added.)  The

court responded that it was too late.  We agree.  A party with the burden of proof cannot

sit back and claim (without presenting supporting evidence) that he can do no better than

obtain a minimum wage job, and then when the court rejects that argument and selects an

income level that was close to his prior income, prevail on an assertion that this amount is

13

unsupported. Based on the facts presented by Father, the court did not err in concluding that $6,500 per month was an appropriate income imputation.[3]

Father's reliance on *Eggers* is unavailing. In *Eggers*, a father sought to modify a prior child and spousal support order after he lost his job based on his own misconduct. (*Eggers, supra*, 131 Cal.App.4th at p. 697.) The family court denied the modification, reasoning that because the father was at fault for losing the job, it was appropriate to impute an income to Father at the same level as his prior job. (*Id.* at p. 698.) The reviewing court reversed, concluding the court abused its discretion by imputing income without considering the father's ability and opportunity to earn the same amount in a new job. (*Id.* at pp. 699-701.) The court explained that, unlike a voluntary job loss where a parent is considered to have voluntarily divested himself or herself of income, it is generally not reasonable to *presume* a parent had the opportunity and ability to earn the prior amount after an involuntary job loss. (*Ibid.*) However, in remanding, the *Eggers* court made clear that it was the father's "burden to prove that he either lacked the ability to find employment or had no reasonable opportunities to obtain employment." (*Id.* at p. 701.) The court noted that the trial court did not reach these issues and therefore remanded "the matter to the trial court to conduct a new hearing and determine whether income should be imputed to father under Family Code section 4058, subdivision (b), and, if so, the amount of such income to be imputed." (*Id.* at p. 697.)

---

3    Of course, to the extent Father does in the future make diligent efforts to obtain a job at the $6,500 level and then is unsuccessful, he can file a new motion regarding *prospective* support payments and seek to prove this claim with admissible evidence.

Unlike *Eggers*, the court here did not impute an income to Father without considering whether Father had the ability and opportunity to obtain employment. In *Eggers*, the trial court merely presumed the ability and opportunity based on the father's prior misconduct, without evaluating the evidence. This case is materially different because the court here fully considered Father's evidence, but found Father did not meet his burden to show a lack of opportunity or ability to earn his prior income.

Father alternatively suggests that once he met his burden to show a lack of opportunity or ability, Mother had the burden to show he had the ability and opportunity to earn the claimed imputed income amount. However, because Father never met this initial burden, the burden never shifted to Mother. In any event, Father's asserted burden-shifting rule is not a correct statement of California law. Generally, with respect to an initial support order, the party seeking imputation must show the availability of jobs consistent with a party's skills and qualifications. (See *In re Marriage of Wittgrove* (2004) 120 Cal.App.4th 1317, 1329.) However, the rule is different when the payor spouse seeks a modification of an existing order based on changed circumstances. A payor spouse who seeks a downward adjustment after a life change, such as a job loss, generally has the burden to show he or she did not have the opportunity or ability to earn an equivalent income in a different job. (See *Bardzik, supra*, 165 Cal.App.4th at pp. 1304, 1308; *Eggers, supra*, 131 Cal.App.4th at p. 701.) This is true regardless whether the job loss was voluntary or involuntary. In this case, Father did not meet his burden, and Mother did not have the burden to come forward with evidence regarding the availability of jobs at the $6,500 income level.

15

Father's reliance on *In re Marriage of Cohn* (1998) 65 Cal.App.4th 923 (*Cohn*) is also unhelpful. In *Cohn*, the father, an attorney, produced evidence that he made numerous, exhaustive attempts to find work in a law firm after he was hospitalized for a mental breakdown. (*Id.* at pp. 925-927.) The trial court imputed an earning capacity of $80,000 per year, despite that the father had no recent earnings history of this amount. (*Id.* at p. 927.) The father appealed, and the court reversed, noting that "figures for earning capacity cannot be drawn from thin air; they must have some tangible evidentiary foundation." (*Id.* at p. 931.) The court stated that on remand, the trial court should "focus" (*id.* at p. 930) on the amount the father "could reasonably expect to earn as a sole practitioner . . . , his stated goal at the time of trial and a reasonable one given his recent history in pursuing employment." (*Id.* at p. 931.)

*Cohn* is distinguishable. First, *Cohn* concerned an initial support order, whereas here we are dealing with a motion to modify an existing judgment. Second, in *Cohn*, unlike here, the father had no recent earning history and had made numerous meaningful (although unsuccessful) efforts to obtain a job. Additionally, the *Cohn* court's directions that the family court should consider on remand the potential income level of a solo attorney practitioner was consistent with the trial court's analysis here, evaluating the amount a person could be expected to earn in the parent's existing profession, particularly in light of prior earnings.

### III. *Best Interests of Children*

Father additionally contends the court erred because it did not consider the best interests of his children in imputing an income to him. Family Code section 4058,

16

subdivision (b) states: "The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children." Under this code section, a court may impute an income only if the imputation is in the best interests of the children. (See *In re Marriage of Ficke* (2013) 217 Cal.App.4th 10, 13 (*Ficke*).)

Contrary to Father's assertions, the record supports that the court considered the best interests of the children. The court's comments confirm that the court evaluated all relevant factors, including the needs and interests of the minors regarding their living situation with each parent. The court's finding that the income imputation served the minors' best interests was supported by the evidence. Whereas Father was living in a home and had substantial ability to earn a reasonable income, Mother was living in a trailer on the property, had various medical problems and did not have an ability to obtain a high paying job. Although Mother had a portion of the settlement funds in her bank account to use to rebuild the home lost in the fire, it is not clear whether those funds would be sufficient to build an equivalent home for the children to live. Further, because the parents equally shared custody of the children, there is no basis for finding that the imputation of income upon Father would unfairly burden the children.

In this regard, this case is different from *Ficke, supra*, 217 Cal.App.4th 10 and *Cheriton, supra*, 92 Cal.App.4th 269, relied upon by Father. In each of those cases, the lower court had imputed an income to the spouse who had sole or primary custody, and had failed to make an express *or* implied finding that it had considered the best interests of the children.

17

In *Ficke,* a mother had 95 percent custody of two teenage children and earned $251 monthly income.  (*Ficke, supra*, 217 Cal.App.4th at p. 12.)  The family court nonetheless imputed a monthly income of $13,333 to the mother, based on a job that had been offered to her that would require substantial travel and work on evenings and weekends.  (*Id.* at pp. 16, 22.)  The reviewing court found the imputation of the income for child support purposes under these circumstances was an abuse of discretion.  (*Id.* at pp. 13, 25.)  The court reasoned "there was no finding imputation would be in the children's best interest" and instead the evidence "points [only] to an affirmative detriment to the children resulting from imputation."  (*Id.* at p. 22.)  Focusing on the mother's status as the primary custodial parent, the court stated the imputation would make "less money available for the children" and would mean that the custodial parent would have less time with the children on evenings and weekends.  (*Ibid.*)

In *Cheriton,* the reviewing court similarly reversed after determining "the trial court made no express *or* implied finding that imputing earning capacity to [the custodial parent] would be in the children's best interest."  (*Cheriton, supra*, 92 Cal.App.4th at p. 301, italics added.)  In remanding, the court noted in dicta that it found "it difficult to imagine how the children's interests are served by doing so, since the imputation of earning capacity to [the custodial parent] effectively reduces overall monetary support for the children."  (*Ibid*.)  But the court went on to state that "we need not speculate on that question here, since the determination is properly left to the trial court on remand."  (*Ibid.*)

Father is in a different position from the parents in *Ficke* and *Cheriton* because he shares equal custody with Mother.  Neither *Cheriton* nor *Ficke* created a rule prohibiting a court from imputing income to a parent merely because he or she shares custody of the children.  Moreover, we do not interpret either decision as creating a blanket rule that a court must make an express best interests finding in any imputation case.  The record here shows the court considered the minors' best interests and impliedly found that income imputation would serve those interests, and the evidence supports the court's findings.[4]

## DISPOSITION

Order affirmed.  Appellant to bear respondent's costs on appeal.

HALLER, J.

WE CONCUR:

NARES, Acting P. J.

AARON, J.

---

[4]  In his brief, Father also challenges the court's use of a 49.99 percent custody timeshare for him.  This claim is forfeited because it was not raised in the proceedings below.