Filed 10/20/15  Marriage of Munn CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re the Marriage of RUSSELL MUNN and VERA MUNN. | |
| RUSSELL MUNN,<br>        Respondent,<br>v.<br>VERA MUNN,<br>        Appellant. | A140673<br><br>(Alameda County<br>Super. Ct. No. AF11592156) |

Russell Munn filed a petition to dissolve his marriage to Vera Munn and moved out of the family home they shared with their children.  Vera[1] appeals from an order modifying the amount of child support and temporary spousal support payable by Russell, arguing the trial court abused its discretion by imputing $75,000 in income to her when calculating those figures.  She also contends a $1,000 sanctions order against Russell was insufficient in light of his misconduct during the litigation.  We affirm.

FACTUAL AND PROCEDURAL HISTORY

A.  Family Background

Russell and Vera were married in 2002 and have four children:  Milla (born in 2002), Lilia (born in 2004), Boris (born in 2006) and Ivan (born in 2007).  Lilia suffers from Rett syndrome, a neurological disorder that prevents her from walking, talking or

---

[1]  We use the parties' first names because they share a surname.

1

using her arms, and which necessitates her constant care. She is not cognitively disabled and attends public school with the help of an attendant. At the times relevant to this proceeding the family lived in a home they owned in Piedmont, though Russell's work required him to travel to other parts of the country.

Vera worked as a marketing executive during the early years of the marriage. She was employed by Nestle Ice Cream Company between 2001 and 2005, where she earned between $150,000 and $240,000. Vera left her chosen field after Lilia was diagnosed with Rett syndrome so she could care for Lilia and the other children.

By all accounts, Vera has been a tireless advocate for Lilia and has spent a tremendous amount of time participating in early intervention programs, training and therapies designed to improve her condition. She has navigated the maze of health care, public education and Regional Center services on Lilia's behalf. In 2005, she began her own part-time business as a consultant and advocate for children with disabilities, assisting families in their dealings with school districts and Regional Centers.

Russell, who worked as an investment banker, became the family's primary source of financial support after Vera left the field of marketing. Though his income was significantly higher in previous years, since 2011 he has worked at a real estate investment firm in Los Angeles for a gross base salary of $20,000 a month plus a year-end bonus. In 2013, the gross amount of his yearly bonus was almost $136,000, or an average of $11,333 a month.

B. Divorce Proceedings

Russell filed a petition for dissolution of the marriage on August 25, 2011, commencing what the trial court described as a "high-conflict case." Because an exhaustive description of the filings and hearings would be of little value in explaining the issues before this court and would sidetrack the reader, we give an abbreviated overview to provide context for the challenged orders, namely, the imputation of income to Vera and the imposition of $1,000 in sanctions against Russell.

Vera has been prolific in her filings of pleadings and motions, having presented a total of 29 motions between August 2011 and September 2013. She has repeatedly sought to limit Russell's custody and visitation with the children, alleging he has been controlling and abusive toward his family and is unable to adequately supervise and care for the children during visits. Vera has also filed a number of motions claiming Russell has failed to timely reimburse her or pay for various "add-on" expenses as ordered by the court. She has brought multiple motions to compel discovery and filed three separate contempt charges against Russell, asking in one such proceeding that he be thrown in jail. A harassment complaint was filed by Vera against Russell's girlfriend. Heated and accusatory emails have been exchanged between Russell and Vera and between Russell and a former friend of his who has since loaned Vera a considerable amount of money. The portrait of the family painted by Vera throughout this case has been that she and her children are on the verge of homelessness while Russell lives rent free with his girlfriend in Los Angeles.

Russell's response has been to vociferously deny Vera's characterization of him as abusive or inept at caring for the children, pointing to the favorable observations of a visitation supervisor who was appointed for a period of time to assess their contacts. (The trial court has allowed Russell visitation over Vera's objection.) Russell has taken the position that Vera spends money too freely, and he has opposed many of her expenditures, including what he characterizes as uninsured experimental drugs for Lilia's treatment, and camps, classes and recreational activities for the children that are outside the family's budget. According to Russell, he is unable to make ends meet despite his high salary because of the amount of support he is required to pay, the costs of traveling to and from visitations, and Vera's failure to take reasonable steps to secure employment outside the home.

The trial court has repeatedly expressed frustration with the parties' inability to resolve issues outside of court. In a hearing held on February 27, 2012, it worried aloud that the case could become "the lengthiest, most protracted, and unpleasant of the thousands that the Court has dealt with over the last few years." On May 29, 2012, the

3

court described the case as "coming close to setting an all-time world record for the thickest file that hasn't been on file with this court for that long." At a hearing on July 16, 2012, the court stated it was "pretty close to shock" at the parties' "demonizing" of each other, chastised them for their inability to resolve basic issues without court intervention, and ordered them both to attend anger management courses or counseling.

In an attempt to manage the conflict between the parties regarding visitation issues, the court ordered Russell and Vera to retain a parenting coordinator, with Russell to advance the coordinator's retainer fee. This appointment led to another round of conflict when Russell was unable to pay the coordinator's fee as he had been ordered to do, a circumstance that points to another defining characteristic of this case: financial hardship notwithstanding a household income that could, under other circumstances, support a comfortable lifestyle. The family had little if anything in the way of savings, assets or equity in real property when the dissolution proceeding began, and their expenses were high due primarily (though not exclusively) to the uninsured costs of Lilia's care. The family has relied primarily on Russell's year-end bonuses to pay outstanding debts. The trial court admonished the parties that their spending was "unsustainable" and they were "living beyond their needs." A special master over the family's finances was ultimately appointed at the same time as the orders challenged in this appeal.

Vera was granted permission to move to Chicago with the children, where her family lives.

### C. December 2011 Support Order

On December 20, 2011, the parties stipulated that Russell would pay family support of $7,200 for that month, and would pay $4,553 in child support and $2,560 in temporary spousal support for the month of January, with support to be revisited at the next scheduled hearing. Other expenses were to be split evenly between Russell and Vera and Vera was to provide Russell with a log of her job search efforts on a biweekly basis. Also pursuant to the parties' stipulation, the court issued a *Gavron* warning to

4

Vera (*In re Marriage of Gavron* (1988) 203 Cal.App.3d 705, 712), advising her she needed to make reasonable efforts to become self-supporting.

D.  January 2012 Support Order

On January 17, 2012, the court ordered that Russell pay Vera the guideline amount of $4,816 in monthly child support and $3,500 in monthly temporary spousal support.

E.  April 2012 Support Order

In an income and expense declaration filed February 27, 2012, Russell indicated he was earning $20,000 in gross income each month plus a $500 car allowance, had $7,537 in monthly expenses that included $1,700 in rent, and had paid his attorney $21,217 to date and owed an additional $3,500 in legal fees.  In an income and expense declaration filed on April 3, 2012, Vera indicated that she earned $1,868 in gross monthly income as an in-home supportive services worker (reflecting monies received from Medi-Cal for caring for Lilia), had received an average of $204 each month in her business as an advocate for families with disabled children, and had total monthly expenses of $31,149, including $2,714 in mortgage payments, $2,353 in property taxes, $6,026 in unreimbursed health care, $5,520 in the children's education expenses and $4,500 in insurance payments.  She owed $2,420 to her attorney.

At a hearing held April 9, 2012, the court ordered Russell to pay Vera $9,750 in combined monthly child and spousal support ($5,220 in child support, $2,983 in spousal support, and $1,550 add-on expenses).  The court also issued a wage assignment order.

F.  September 2012 Support Order

On September 18, 2012, Russell filed a motion to reduce child and spousal support on the ground that Ivan was no longer in preschool and Russell's visitation time-share was 10 percent rather than 5 percent.  At a hearing on September 24, 2012, the court recalculated support to arrive at a guideline amount of $4,979 for child support, $2,758 in spousal support, and recurring add-on expenses of $336 for speech therapy and hippotherapy for Lilia, for a total of $8,073 a month.

5

G.  Vera's Unpaid Position at Greenteaspoon

At a hearing on October 18, 2012, Vera advised the court she had a job at a start-up company called Greenteaspoon, but no one there was drawing a salary because it had not yet raised sufficient capital.  She was "essentially" volunteering about 20 hours a week in an attempt to get back into her industry after a seven-year absence.

In an update to a settlement conference statement filed on November 20, 2012, Vera supplied an email from the chief executive officer of Greenteaspoon stating Vera was not an employee, had not been paid, and had not declined compensation.  Vera explained in her update that her previous work in marketing for large corporations had involved long hours and overnight travel, which was no longer possible in light of Lilia's condition.  An unsuccessful job search had demonstrated she was uncompetitive after her absence from marketing, and the unpaid position with Greenteaspoon enabled her to renew her work experience and regain a foothold in her former field of employment.

In a settlement conference statement filed March 15, 2013, Russell stated that Vera was working 40 hours a week for Greenteaspoon and urged the court to impute $248,000 in annual income to her, reflecting the median income for chief marketing officers (CMOs) with comparable education and experience.  Vera submitted a settlement conference statement on March 15, 2013, in which she proposed that Russell be ordered to pay guideline child support plus add-on expenses and continue to pay spousal support until she was paid by Greenteaspoon or found a paying position.  She argued that any imputation of income to her would impair her ability to care for the children because she could not take a job that required her to travel and would require significantly more at-home assistance if she found another position.

At a hearing on March 23, 2013, Vera advised the court she was working full time at Greenteaspoon for no compensation because the start-up had not yet received venture capital funding.  Her position there required her to travel to Palo Alto for meetings on Tuesdays and Thursdays, but she could work the rest of the time at home, permitting her to care for the children.  She had started looking for work when the marriage started having problems in 2010, interviewing with companies such as Clorox and Basic

6

American Foods, but realized after about two years without success she would need to take steps to get back into the work force. She had obtained state funding for 56 hours of nursing care each week for Lilia, but there was a shortage of nurses doing that kind of work so she received only about 25 hours a week of assistance, turning to private nurses to fill in the gaps.

H. May 20, 2013, Add-On Expenses

At a hearing on May 20, 2013, Vera was given full discretionary authority over medical decisions with the parties to share equally in those expenses, and a procedure for negotiating extracurricular activities for the children was established. Russell was ordered to pay one-half of child care for a trip Vera was taking to Chicago to seek employment. Russell was ordered to pay $4,778 (one-half of $9,556) in monthly add-ons in addition to child and spousal support.

I. Income and Expense Declarations—July and August 2013

In an income and expense declaration filed by Vera on July 24, 2013, she listed her occupation as a CMO with Greenteaspoon, but declared no income other than spousal support of $2,982. Her monthly expenses were $18,051, and she had paid attorney fees of $66,000 to date and owed an additional $14,700.

In August 15, 2013, Russell filed an income and expense declaration indicating a gross monthly income of $21,385 and an average gross monthly bonus income of $11,333. He claimed total monthly expenses of $6,865, including $1,500 in rent and costs of $1,800 relating to visitation. He had paid attorneys $19,000 to date and owed an additional $13,500.

J. Motion to Impute Income to Vera

On September 24, 2013, Russell filed a motion requesting that the court impute $150,000 in annual income to Vera and reduce support accordingly. In his accompanying declaration, he stated the following reasons for his request: (1) Vera had been working 40 hours a week for zero compensation for over a year and had made "next to no effort to obtain gainful employment"; (2) due primarily to Lilia's special needs, the

7

children's uninsured health care expenses were approximately $8,000 a month, and his salary alone was insufficient to cover this amount in addition to support and other expenses; (3) because he could not afford to support the family on his salary alone, he had to wait for his semiannual bonus payments to cover certain expenses, which completely depleted those bonus payments; and (4) reducing his support obligations in an amount commensurate with Vera's earning capacity would enable him to make timely payments on these obligations "consistent with our children's best interests." Russell stated in his declaration that Vera had not provided him with regular reports about her job search as required by court order.

Russell retained the services of Phillip Sidlow, a vocational economic analyst with the firm of Vocational Economics, Inc., to render an opinion about Vera's employability and earning capacity. Sidlow submitted a declaration stating that in his opinion, Vera had an earning capacity of $135,000 to $240,000 a year based on her education and work experience.

Sidlow considered that Vera had a B.A. in economics and finance and an M.B.A. with a concentration in marketing. She was fluent in Ukrainian, Russian and Serbo-Croatian and proficient in Microsoft Office and other business-oriented software. From 1996 to 1998, she had worked for Kraft Foods as a group assistant brand manager and earned approximately $125,000 a year. From 1999 to 2001, she had worked as a freelance marketing consultant, providing strategic and branding expertise to packaged goods and dot-com companies. From 2001 to 2005, Vera was the senior marketing manager for Nestle Ice Cream Company (Dreyer's) and the general manager of the Starbucks Ice Cream Partnership, launching a number of products and overseeing the development, manufacture and distribution of Starbucks Ice Cream. Her salary between 2001 to 2005 ranged from $150,000 to $240,000.

Sidlow noted that Vera had a daughter with Rett syndrome who required constant care, though she attended a public school and was entitled to 55 hours of home nursing care provided by the state. From 2005 to 2010, after leaving the marketing field, Vera became a consultant for families of children with disabilities and assisted over 30

families under the auspices of her own firm, charging an hourly rate of $150. From 2010 to 2012, Vera volunteered as marketing director for Cook! SF, an Inner City Advisors (ICA) portfolio company. She advised ICA, a firm that backed companies with revenues in the range of $1 million that provided jobs for inner city residents and had socially responsible policies.

From 2012 to the present, Vera had worked in an unpaid position as the CMO for Greenteaspoon, a start-up whose business was the production of foods designed to relieve digestive distress. She had been responsible for building the company's marketing organization from the bottom up, helped create materials for investors, and pitched the company to venture capital firms and "angel" investors. The firm had not raised sufficient capital to launch the products into the retail sector, and the position did not seem to have long-term potential.

Vera's efforts to obtain paying employment included job logs showing five efforts in April 2012, five efforts in January/February (no year provided), and seven efforts in July 2012; email correspondence with representatives of several companies in May 2013 regarding open positions, including Del Monte, Optimum Nutrition, thinkThin, Inc., Diamond Foods, Fair Oaks Farms Brands and Levi Strauss; email correspondence in June 2013 with a proposal for Shrek Gummy Vitamin Company; email correspondence with Global Executive Associates in 2013 indicating she was not being considered for a position; and email correspondence in August 2013 regarding a position at Gap, Inc. Sidlow noted that Vera appeared to be familiar with good faith job search methods and had been utilizing her network of contacts, executive search firms and the Internet, but the documented search efforts occurred primarily after May 2013 and he could not say whether she had made similar efforts before that time.

Relying on salary data from the Economic Research Institute, Sidlow reported that the 2013 median annual base salary of CMOs in the Oakland area working for companies with revenues of $1 million was $134,079. For companies with revenues of $2 million, the median base salary is $151,270, and for companies with revenues of $5 million it was $175,549. The median base salary for CMOs in companies with annual revenues of $10

9

million was $197,719, and for companies with annual revenues of $100 million, the base salary was $283,300. Base salaries would be about 8 percent less in the Chicago area, where Vera wished to move. Sidlow listed a number of open marketing positions advertised in September 2013 in the Bay Area, Chicago and Los Angeles.

K. Vera's October 2013 Request for Attorney Fees and Sanctions/Opposition to Imputation of Income or Reduced Support

On October 3, 2013, Vera filed a motion seeking $80,000 for attorney fees and sanctions under Family Code sections 271 and 2030,[2] inclusive of $30,000 in sanctions she had previously requested. She alleged that Russell's failure to comply with court orders had necessitated most of the fees she had incurred during the litigation and urged the court to find that the circumstances of the case supported an award of need-based fees under Family Code section 2030. Vera urged the court to deny Russell's request to impute income to her, noting it was not realistic for her to earn her former salary in light of Lilia's needs and that any imputation would be offset by the cost of a nanny and private nursing that would be necessary if she were to go to work.

Vera asked for an upward departure in guideline child support based on Lilia's disability, as well as greater add-on expenses to cover a prescription for Increlex, a medication to promote Lilia's growth, on an ongoing basis. She submitted a declaration from Dr. Mary Jones, Lilia's treating physician, who praised Vera's extraordinary efforts in caring for Lilia, enumerated Lilia's prescriptions and therapies, confirmed the shortage of in-home nursing care in California, and commented on the "unbearable amount of stress" caused by caring for four children alone on limited funds. Dr. Jones noted that Lilia had severe reflux problems and potential seizure activity at night, along with general sleeplessness, meaning that any employment requiring Vera to travel would be difficult to sustain.

---

[2] Further references are to the Family Code unless otherwise indicated.

In replies and supplemental papers to the pending motions, the parties disputed (as they had throughout the litigation) whether Russell had paid everything he owed to Vera and whether he had provided the discovery she requested.

L. October 10, 2013, Hearing

On October 10, 2013, the court held a hearing on the various matters, including Russell's request for a modification of the support orders and Vera's request for need-based attorney fees and sanctions. The parties discussed various medical and child care expenses. Vera advised the court that because the hours of nursing care that had been allocated by the state were not being fulfilled, she required an additional 32.5 hours of paid care during the week and 12 hours each day on the weekend, for a total of 56.5 hours. Assuming a cost of $20 per hour, this would amount to $4,898.67, which the court noted was higher than the base monthly amount for child support. The court indicated, "[T]his is where we get to a question of I don't know how the families are going to financially survive this."

Vera asked the court not to impute any income to her, but argued that the maximum that should be imputed was the $1,868 a month ($22,416 annually) she had been receiving previously from Medi-Cal for her work with Lilia. She advised the court she had a job interview in Chicago for a marketing position that would likely pay an annual salary in the $100,000-plus range, but had no offer as yet.

The court initially indicated it would impute income of $100,000 to Vera, noting she had been working full time for a year with no salary and had received the benefit of added support since the beginning of the case. It observed, "The problem with not imputing an appropriate level of income to [Vera] is it distorts the financial reality of this situation."

After further discussions with the parties, the court made a tentative ruling addressing a number of issues. It imputed $75,000 in annual income to Vera and, based on a five percent time-share of the children by Russell, ordered Russell to pay Vera base monthly child support of $4,999, monthly recurring add-on expenses of $4,374, and

11

monthly spousal support of $2,115, for a total of $11,488.  The add-on expenses included Russell's half of the following monthly expenses:  $1,440 in physical therapy for Lilia, $360 in hippotherapy, $120 in speech therapy, $2,710 for Increlex, $228 for a chiropractor, $2,320 for applied behavioral analysis therapy, $600 for augmentive communications, and $190 for orthodontia.  The add-on support also included $180 a week for various other therapies for the children.  The court deferred a ruling on Vera's request for attorney fees and sanctions and set the matter for a hearing on December 2, 2013.

   M. <u>Written Tentative Order and Objections</u>

   The court issued a written tentative order on October 18, 2013.  In addition to its modification of support as outlined above, the court made a tentative ruling on Vera's request for attorney fees and sanctions in view of the extensive briefing and arguments already presented.  The court stated it was "not persuaded by [Vera's] argument that [Russell's] bad conduct necessitated her filing of 22 of the 29 motions filed between August 25, 2011 and September 23, 2013.  Barely a month passed where [Vera] did not file a motion, in fact, in most months, [Vera] filed multiple motions, often duplicating issues already pending determination.  This Court is aware of few, if any, substantive meet and confer attempts between the parties prior to the filing of each of these motions, and the Court finds that [Vera's] conduct has only served to exacerbate rather than resolve these already contentious dissolution proceedings."  (Fns. omitted.)

   Accordingly, the court denied Vera's request for "$80,000 on top of the $30,000 initially awarded."  Noting that Russell did "bear some level of responsibility for unnecessarily prolonging this action" and had greater access to funds (though he had been unable to pay his own counsel while simultaneously satisfying his support obligations) the court awarded Vera $25,000 in need-based attorney fees under section 2030, subject to reallocation, and stayed payment of those fees until Russell received his year-end bonus.  The court also ordered Russell to pay $1,000 in sanctions under section

12

271, payable at a rate of $200 a month, based primarily on his failure to timely pay add-on expenses as ordered on May 20, 2013.

Vera filed written objections to the tentative ruling on October 23, 2013. She noted that she had not been previously awarded $30,000 in fees as assumed by the court's order, making it appropriate to increase the current need-based fee award by $30,000 to reflect an appropriate amount. She argued the court did not act in the best interests of the children by imputing $75,000 in annual income to her, and that the court's $75,000 figure was not based on an adequate evidentiary foundation. Vera requested the appointment of a special master over financial issues and asked the court to order Russell to pay the cost of a vocational expert appointed by the court to evaluate her earning capacity.

Russell filed a written objection to the court's order on October 24, 2013, in which he asked the court to further reduce the support ordered and objected to the award of attorney fees and sanctions.

### N. Final Order Issued November 7, 2013

The court issued a final written order on November 7, 2013, in which it left intact its calculation of child and spousal support and its imputation of $75,000 in annual income to Vera. The court specifically overruled Vera's objection to the imputation of income, stating: "[Vera's] full time employment with Greenteaspoon over the past year demonstrates her ability to work—arguably at a much higher income level than was imputed—and [Russell] cannot be expected to continue shouldering 100% of the burden associated with what [Vera] characterizes as what has 'essentially been volunteering.' " The court denied Vera's request for an order requiring Russell to pay the cost of her own vocational expert.

As to attorney fees and costs, the court indicated that in light of the objections to the $25,000 attorney fee award from both parties, it would hear argument on this issue on December 2, 2013, with Vera to file a breakdown of the services underlying her fee request. As to the $1,000 in sanctions, that order was stayed pending the December 2

13

hearing, with the court to consider its modification if Russell paid certain outstanding expenses and added money to the parties' escrow account as previously ordered.

Vera appealed from the November 7, 2013, order.

DISCUSSION

I. *Imputation of Income to Vera; Child Support*

Vera argues the trial court erred when it imputed $75,000 in annual income to her for the purpose of calculating child support. We reject the claim.

A. General Principles and Standard of Review

Both parents have an obligation to support their children. (§ 3900.) When determining each parent's income for purposes of calculating the amount of child support, the trial court is not limited to a consideration of the parent's actual income. (*In re Marriage of Destein* (2001) 91 Cal.App.4th 1385, 1391 (*Destein*).) "The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children." (§ 4058, subd. (b).) For purposes of determining support, "earning capacity" represents the income the parent " 'is reasonably capable of earning based upon the spouse's age, health, education, marketable skills, employment history, and the availability of employment opportunities.' " (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 301 (*Cheriton*).)

"A trial court's decision to impute income to a parent for child support purposes based on the parent's earning capacity is reviewed under the abuse of discretion standard." (*Destein*, *supra*, 91 Cal.App.4th at p. 1393.) On appeal, " '[w]e consider only "whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion." [Citation.] . . . "[W]e do not substitute our own judgment for that of the trial court, but determine only if any judge reasonably could have made such an order." ' [Citation.]" (*In re Marriage of McHugh* (2014) 231 Cal.App.4th 1238, 1247.) This standard requires us to affirm the trial court's

14

order unless it was arbitrary or capricious. (See *In re Marriage of Lim & Carrasco* (2013) 214 Cal.App.4th 768, 778.)

B. Best Interests of the Children

A family court's discretion to impute income to a parent for the purpose of calculating child support is circumscribed by the statutory requirement that the imputation be in the best interests of the children. (§ 4058, subd. (b); *Cheriton*, *supra*, 92 Cal.App.4th at p. 301.) Thus, any imputation of income must be accompanied by a best interests finding. (*In re Marriage of Ficke* (2013) 217 Cal.App.4th 10, 18-19 (*Ficke*); *In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1051, fn. 3; *In re Marriage of Mosely* (2008) 165 Cal.App.4th 1375, 1389 (*Mosely*).) Vera argues the order modifying child support must be reversed because the trial court did not expressly find that imputing $75,000 to her was in the best interests of the children, and, in any event, such a finding would not be supported by the evidence. We disagree.

Preliminarily, we do not agree with Vera that the best interests finding must be express. (See *Cheriton*, *supra*, 92 Cal.App.4th at p. 301 ["court made no express or implied finding that imputing income to [custodial parent] would be in children's best interest"].) Section 4058 simply provides that a court "may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children." (Compare *In re J.S.* (2011) 196 Cal.App.4th 1069, 1078 [express finding necessary where statute at issue required the court to make a " 'finding either in writing or on the record of the basis for its determination' "].)

Vera objected to the tentative ruling imputing earning capacity, arguing, among other things, that imputation was not in the best interests of the children. When the court issued its final order and did not change this aspect of its tentative ruling, it implicitly found the imputation *was* in the children's best interests.

Viewed in the light most favorable to the prevailing party (*In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28, 34), the evidence supports this implied finding. As the trial court observed on more than one occasion, the family was

living beyond its means and had little or no savings. Russell's salary, though high, was not sufficient to cover the cost of support and the numerous add-on expenses that related largely to Lilia's medical care. Russell was not always able to timely pay his share of additional expenses, and the only way for this family to keep its collective head above water was for Vera to return to the workplace. The court could reasonably conclude that while imputing income to Vera would have the immediate effect of reducing the child support owed by Russell (though not on a dollar-for-dollar basis), it would over time enable Russell to timely pay his obligations and introduce a degree of stability into the family's financial situation.

The court could also conclude that although Vera had made efforts to find a job, her decision to work full time for over a year in an unpaid position had contributed to her inability to find paying work, even if that unpaid position had given her the opportunity to gain current experience after a several-year absence from her chosen field. Imputing an income to Vera provided an incentive for her to earn an income closer to her actual capacity, which would, in the long run, benefit the children and serve their best interests. The base monthly child support payable by Russell with $75,000 imputed to Vera was $4,999, and the base monthly support payable if the court imputed zero income would have been $5,364. The court could reasonably conclude that this difference of $365 a month (which would have been less if the court imputed the $22,416 annually suggested by Vera) was offset by the increased likelihood that Vera would find a paid position in response to the court's order.

Like the trial court, we are cognizant that Lilia's special needs will limit or preclude Vera from taking a position that requires extensive traveling. But because Vera had been working full time for over a year, albeit without pay, it cannot be said that the demands of child care preclude her outside employment. The trial court did not fail to take the children's needs into account, as Vera suggests; rather, the court was faced with a difficult decision as to how to best address the difficult financial circumstances of this family.

16

Vera argues that the court did not factor in the increased cost of child care that would be necessary if Vera were to return to work. The court was well aware that Vera was the custodial parent of four children, one of whom had special needs, and had addressed the child care arrangements and costs at several junctures in these proceedings. We have no reason to conclude the court failed to consider child care costs when determining the amount of income to be imputed, an amount that was half of the $150,000 figure sought by Russell based on his vocational expert's report.

The decision in *Ficke*, *supra*, 217 Cal.App.4th 10, on which Vera relies, is distinguishable. There, the family court imputed average monthly income of $13,333 to a mother who had 95 percent custody of the children, even though the evidence showed that her actual monthly income was approximately $250. (*Id*. at p. 16 & fn. 5.) The mother had earned as much as $729,000 annually at one point in her marketing career, but had been laid off and had received only one job offer for a position that paid $125,000 annually and would have required considerable traveling and evenings away from her two children. (*Id*. at p. 14.) She elected instead to start a pet insurance program modeled after a similar business her mother had started in Arizona, and though she "worked very hard," it was not making any money. (*Ibid*.) Meanwhile, the father earned over $8,000 a month from his job as a real estate broker and from rental income, and owned more than double the value of the mother's assets after factoring in his separate property. (*Id*. at p. 15.)

In reversing the trial court's calculation of child support, the appellate court held that for purposes of the guideline formula, income may not be imputed to a custodial parent absent a finding that the imputation is in the best interests of the pertinent children. (*Ficke*, *supra*, 217 Cal.App.4th at p. 13.) The court explained: "[I]t is counterintuitive—often counterproductive—to impute income to a custodial parent, because the objective effect of such an imputation will be to reduce the money otherwise available for the support of any minor children." (*Id*. at p. 19.) The court concluded there was no evidence it was in the best interests of the children to impute income to the mother because (1) the imputation would have the obvious effect of making less money available

to the children; and (2) imputation would give the mother an incentive to leave two teenagers alone on evenings and weekends.[3]

Vera and Russell do not have the same disparity of resources as the couple in *Ficke*. Though Russell earned much more than Vera at the time of the hearing, he has paid the majority of his net income for child and spousal support, including extraordinary expenses incurred for Lilia. His year-end bonuses have been largely consumed by outstanding expenses. The court appropriately concluded the family's cumulative levels of spending were not sustainable on Russell's salary alone, and neither party had savings or assets to meet the extraordinary expenses. While the order imputing income to Vera had the immediate effect of reducing base child support to about $365 a month less than it would have been if zero income had been imputed, the court could reasonably conclude that Vera's return to working outside the home was an imperative, and that an order imputing income would provide the incentive necessary for her to obtain a paying position. (See *Mosley*, *supra*, 165 Cal.App.4th at p. 1390 [when support provided by father was insufficient to allow mother and children to live according to the marital standard of living, imputation of additional income to mother could increase level of support from her and promote children's best interests].)

C. Evidence of Employment Opportunities

A party seeking to impute income to the other party for the purpose of calculating support has the burden of proving that party has an ability and opportunity to work at the level of income imputed. (*In re Marriage of Regnery* (1989) 214 Cal.App.3d 1367, 1372-1373.) "The 'opportunity to work' exists when there is substantial evidence of a reasonable 'likelihood that a party could, with reasonable effort, apply his or her education, skills and training to produce income.' [Citation.]" (*In re Marriage of Smith* (2001) 90 Cal.App.4th 74, 82 (*Smith*).) Vera contends Russell did not carry his burden of showing she had the ability and opportunity to earn $75,000 a year. We disagree.

_____

[3] The court in *Ficke* also reversed an order requiring the mother to pay spousal support to the father based on the income it imputed to her. (*Ficke*, *supra*, 217 Cal.App.4th at p. 24.)

18

As discussed by vocational expert Phillip Sidlow in his declaration, Vera was highly educated and had extensive employment experience in marketing, even though she had been raising her children and working outside her field of expertise for several years. In her last full-time position, she had earned between $130,000 and $240,00 annually. She had worked for over a year in a full-time but as yet unpaid position with a start-up company where she had significant responsibilities and had gained current marketing experience. The children, including Lilia, were in school during the day, and Vera had secured nursing care for Lilia during non-school hours through the Regional Center, even if she was not able to find someone to work all the hours that had been authorized. The median annual salary for a CMO in the Bay Area was between $134,079 and $283,300, depending on the company's revenues. It was not unreasonable to expect that Vera could find a paid position for at least $75,000 a year, even if her responsibilities to her children made it impossible for her to do the type of traveling she had done in previous positions. (See *Mosley*, *supra*, 165 Cal.App.4th at p. 1391 [imputation of income did not require a showing that a spouse who was a lawyer would have secured a job had she applied for a position; vocational evaluation demonstrated she had substantial earning capacity and could have readily secured a job as an entry-level attorney or paralegal].)

We reject Vera's argument that Sidlow's declaration was inadmissible hearsay under *Elkins v. Superior Court* (2007) 41 Cal.4th 1337 (*Elkins*). Although *Elkins* confirms that family law litigants have the right to cross-examine declarants during a contested trial, it also recognized that certain motions may be resolved on the basis of declarations alone. (*Id.* at p. 1355; *Reifler v. Superior Court* (1974) 39 Cal.App.3d 479, 484-485; Code Civ. Proc., § 2009.) Moreover, even if we were to assume a motion to modify support is a proceeding to which *Elkins* applied, the parties in this case did not request live testimony at the hearing and Vera has forfeited any right to challenge the hearsay nature of the declaration. (*Elkins*, at p. 1354 [declarations at contested trial are inadmissible hearsay unless parties stipulate to their admission or fail to enter a hearsay objection]; *Mendoza v. Ramos* (2010) 182 Cal.App.4th 680, 687 [father was not denied

19

opportunity to cross-examine mother on issue of earning capacity when case was submitted on declarations and neither party requested that live testimony be taken].)

Vera claims Sidlow's status as an expert "was not established through the procedures under Evidence Code [section] 720 [] et seq." We disagree. Evidence Code section 720, subdivision (a) provides, "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." Sidlow was a vocational economic analyst and certified rehabilitation counselor with a bachelor's degree from Yale University and a masters degree from California State University, Northridge. He had been certified as a vocational expert by the United States government and was a fellow of the American Board of Vocational Experts. He had authored numerous articles and contributed to reference books concerning earning capacity and employability issues. Sidlow's education, training and professional experience gave him an expertise in evaluating a person's earning capacity and employability in excess of a lay person. He was qualified to offer an opinion on these issues and the court did not abuse its discretion in considering the declaration. (See *People v. Jones* (2012) 54 Cal.4th 1, 57 ["trial court's determination that a witness qualifies as an expert is a matter of discretion that will not be disturbed absent a showing of manifest abuse"].)

We similarly reject Vera's argument that Sidlow's declaration did not meet the requirements of Evidence Code sections 801 and 802. Section 801 allows an expert to offer an opinion "(a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." Section 802 provides: "A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter . . . upon which it is based . . . ." Vera does not explain how Sidlow's declaration ran afoul of either of these provisions.

20

Earning capacity and employability are issues sufficiently beyond common experience that an expert would assist the court acting as a trier of fact and Sidlow relied on appropriate factors in rendering his opinion: Vera's education and experience, her previous salaries, the current median salaries in the field, and advertisements for open positions in the field.

Vera argues that Sidlow's opinion should not be credited because it does not rest upon a "sound factual basis." She complains he did not meet her before forming his opinion; he relied on Russell's description about the kind of care their four children required; he assumed she had 55 hours of in-home nursing care paid for by the state when in fact these hours had not been satisfied due to a shortage of nurses willing to do this work; and he did not take into consideration her eight-year absence from the labor force. Vera's argument goes to the weight of the declaration rather than its admissibility, and the trial court, as familiar as it was with the underlying facts, was well equipped to consider these issues when evaluating Sidlow's opinion. (See *Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 511.)

Finally, Vera argues there was no "tangible evidence" of employment opportunities for a position with a $75,000 annual salary. We are not persuaded. At the October 10, 2013, hearing at which the income was imputed, Vera had a job interview for a marketing position she believed to be "in the 100,000 range." Vera suggests the trial court based its order on this position alone (for which she was not ultimately hired), but this was not the only evidence of employment opportunities or salary range presented to the court. Sidlow's declaration described the median base salary for CMOs in the three relevant geographic areas (the Bay Area, Chicago and Los Angeles), all of which significantly exceeded $75,000. Sidlow also listed a number of advertised positions in those areas, two of which posted the base salary offered: $200,000 for one and $100,000 to $150,000 for the other. Substantial evidence supports the trial court's implicit determination that Vera had the ability and opportunity to earn $75,000 a year.

21

## II. *Temporary Spousal Support*

A trial court may consider earning capacity and impute income when determining temporary spousal support, just as it may with child support. (*Cheriton*, *supra*, 92 Cal.App.4th at p. 308.) Vera argues the imputation of income for purposes of a temporary spousal support order was erroneous for the same reasons as the imputation of income when calculating child support. We reject her claims.

Temporary or pendente lite spousal support is governed by section 3600, which provides: "During the pendency of any proceeding for dissolution of marriage . . . the court may order . . . either spouse to pay any amount that is necessary for the support of the other spouse, consistent with the requirements of subdivisions (i) and (m) of Section 4320," which sets forth the factors to be balanced by the court in making an order for permanent spousal support.[4] A court has broad discretion to set temporary spousal support, and reversal is appropriate only when the order exceeds the bounds of reason. (*In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1442; *In re Marriage of de Guigne* (2002) 97 Cal.App.4th 1353, 1366.)

Case law has recognized the court may consider other factors enumerated in section 4320 when making a temporary spousal support order. (*In re Marriage of Left* (2012) 208 Cal.App.4th 1137, 1153, fn. 11.) As relevant here, those factors include the marketable skills of the supported party and job market for those skills, the extent to which the supported party's earning capacity is impaired by periods of unemployment during the marriage to permit the supported party to devote time to domestic duties, the ability of the supporting party to pay support, the needs of each party based on the standard of living established during the marriage, the ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in that party's custody, the age and health of the parties, the balance of the hardships to each party, and the goal that the supported party be self-supporting within a reasonable period of time. (§ 4320.) For the reasons already explained, the trial court did

---

[4] Section 4320, subdivisions (i) and (m) allow the court to consider evidence of domestic violence between the parties and the criminal conviction of an abusive spouse.

22

not abuse its discretion by imputing income to Vera, and the factors listed in sections 3600 and 4320 did not require a contrary result.

Vera argues that her need for spousal support militated against an order imputing income to her. We disagree. The historically high earnings of both parties had not saved them from financial distress. The order that Vera challenges requires Russell to pay her almost $11,500 in total monthly support out of his net monthly income, leaving him with about $3,500 a month out of which to pay his own monthly expenses and the costs of traveling to visit the children. His year-end bonus had historically been used to pay expenses for the family that were then currently owing. Thus, while Russell was relatively affluent on paper, his actual circumstances were not markedly better than Vera's. Vera's needs, when compared to Russell's ability to pay, did not render the court's decision to impute income an abuse of discretion.

## III. *Change in Circumstances*

The order setting support on October 10, 2013, modified the prior support order issued September 24, 2012. Vera argues that support should have been maintained at the previously ordered levels because Russell failed to carry his burden of showing the family's circumstances had changed. We disagree.

A change of circumstances is generally required for the modification of support orders, including temporary ones. (*In re Marriage of Samson* (2011) 197 Cal.App.4th 23, 29.) "Absent a change of circumstances, a motion for modification is nothing more than an impermissible collateral attack on a prior final order." (*In re Marriage of Biderman* (1992) 5 Cal.App.4th 409, 412-413; but see *In re Marriage of Murray* (2002) 101 Cal.App.4th 581, 597, fn. 11 [noting that older cases had held no change of circumstances is necessary to modify temporary spousal support orders].)

Circumstances had changed since the September 2012 support order and allowed the court to make an order imputing income to Vera. For one thing, the recurring add-on expenses had dramatically increased by several thousands of dollars, making it appropriate to address whether income should be imputed to Vera when calculating

support. For another, Vera had elected to work full time for over a year in an unpaid position, demonstrating that she did have an ability to work full time in a job that offered her some flexibility.

Moreover, "[i]n this state, when child support is determined based on earning capacity, courts typically have not approached modification actions in terms of changed circumstances. This would seem to be so because the court must decide initially *whether* circumstances have changed, i.e., whether the parent has voluntarily limited his or her income such that it is appropriate to substitute earning capacity. If so, the *amount* of income has not changed for purposes of the support guideline, only its character (from actual income to imputed income)." (*Smith*, *supra*, 90 Cal.App.4th at pp. 83-84.)

### IV. *Attorney Fees as Sanctions*

Vera argues the trial court should have required Russell to pay more than $1,000 in attorney fees and costs as sanctions under section 271. Russell submits her challenge is premature, because the order was stayed pending a future hearing, at which point the court would consider modifying the order (presumably by denying sanctions or reducing the amount of sanctions) if Russell paid certain outstanding amounts to Vera and the parties' escrow account. The record does not reflect whether Russell paid the amounts at issue or whether the court subsequently modified the sanctions order.

Assuming the order was sufficiently final to be appealable, we find no error. Section 271, subdivision (a) provides in relevant part: "Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys. An award of attorney's fees and costs pursuant to this section is in the nature of a sanction." An order awarding sanctions under section 271 is "committed to the discretion of the trial court, and will be reversed on appeal only on a showing of abuse of that discretion, that is 'only if, considering all of the evidence viewed more favorably in its support and indulging all

24

reasonable inferences in its favor, no judge could reasonably make the order.' " (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1524.)

Vera argues that $1,000 is insufficient to penalize Russell for his defiance of court orders throughout the litigation. While the court found Russell's failure to timely transfer certain bonus funds and pay certain add-on expenses ordered in May 2012 "concerning," the record amply supports a determination that Vera's own conduct over the course of the case had contributed unnecessarily to litigation costs and the parties' inability to settle. And, even if Vera incurred more than $1,000 in fees and costs to recover the add-on expenses at issue, the sanctions imposed under section 271 need not "compensate for all fees and costs expended." (*In re Marriage of Battenburg* (1994) 28 Cal.App.4th 1338, 1346.)[5]

## DISPOSITION

The judgment is affirmed. In the interests of justice, the parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

---

[5] Russell has filed a request for judicial notice of the Statement of Decision and Judgment on Reserved Issues filed in this case on September 10, 2014 and February 23, 2015, respectively. (Evid. Code, §§ 452, 459.) We deny that request as unnecessary for our resolution of the issues on appeal. (See *JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 174.)

25

_____

NEEDHAM, J.

We concur.

_____

JONES, P.J.

_____

BRUINIERS, J.