[Civ. No. 38065. Second Dist., Div. Five. Nov. 19, 1971.]

JOAN C. STARE, Plaintiff and Appellant, v.
JOSEPH TIMOTHY TATE, Defendant and Respondent.

**COUNSEL**

Downs & Sampson and Patrick J. Sampson for Plaintiff and Appellant.

Beardsley, Hufstedler & Kemble and William F. Peters for Defendant and Respondent.

**OPINION**

**KAUS, P. J.**—Plaintiff appeals from an adverse judgment in an action to reform a property settlement agreement with her former husband, the defendant, and to enforce the agreement as reformed.

### FACTS

The agreement in question was signed by both parties on February 21, 1968. It was the culmination of protracted negotiations which had been going on for several years. Both sides were represented by counsel at all times.[1]

In the negotiations both sides apparently agreed that the community property was to be evenly divided. They did not agree, however, on the

---

[1]The attorneys who represent the husband on this appeal did not act for him in the negotiations.

value of certain items and on the community property status of certain stocks which stood in the husband's name alone.

These disagreements centered principally on items which, it was understood, were to be retained by the husband.

In particular the wife, Joan, had an *idée fixe* that certain real property (the Holt property) which she and the husband, Tim, owned as tenants in common with his brother, was worth $550,000.[2] The husband's valuation was somewhere between $425,000 and $450,000. Joan had very little evidence on which to base her contention: First, there was a statement by Tim's parents when they had owned the property that it was worth about $550,000; second, a former attorney of Tim's had, in 1966, written a letter to Joan's attorney which contained a settlement offer based upon a value of $550,000.[3]

The second important area of disagreement centered on the ownership of stock in a family corporation and the proper basis for its valuation. In all Tim owned 25,500 shares. Of these he had owned 5,000 shares long before he married Joan. Joan realized that any claim that these 5,000 shares were community property was tenuous, at best. Similarly, on his part, Tim conceded that a block of 7,500 shares was community property. Another block of 5,000 shares was, according to Joan, given to her and Tim as a wedding present by his parents. Yet another block of 8,000 shares was, again according to Joan, given to both her and Tim as a present during their marriage. The shares were, however, in Tim's name alone and he denied that the community had any interest in them.

The book value of the shares was a little less than $7.00 per share. Joan claimed that the fair market value was, however, $1.50 per share over the book value and that Tim should "buy" her community interest in the shares at that value.

To sum up: If Joan was correct with respect to the value of the Holt property, her community property interest in it was about $25,000 higher than Tim conceded; if she were to succeed on her contentions with respect to the stock, Tim would have had to pay her roughly $40,000 more than he was willing.

---

[2]At the time of the property settlement, the property was encumbered to the extent of about $308,000.

[3]Based on the $550,000 figure, taking into account several encumbrances and the fact that the community only owned a 50 percent interest in the property, the attorney arrived at an equity of $60,000. As will be seen, about 15 months later the equity based on the $550,000 figure was worth, roughly, $120,000. The record does not indicate why there was such a big change in such a relatively short time. Presumably, at least part of it is due to payments on the encumbrances.

In January 1968, Joan's attorney prepared a document entitled "SECOND PROPOSAL FOR A BASIS OF SETTLEMENT—TATE *v.* TATE" which, among other things, arrived at a suggested figure of $70,081.85 for the value of Joan's share in the Holt property. This value was arrived at by a computation set forth in the proposal. It is copied in the footnote.[4]

It is obvious that Joan's attorney arrived at the figure of $70,081.85 for the community equity in the property only by making two substantial errors. First, the net value after deducting the encumbrances from the asserted gross value of $550,000 is $241,637.01, not $141,637.01; second, one-half of $141,637.01 is substantially more than $70,081.85. The correct figure for the equity should have been $120,818.50 or, roughly $50,000 more.

The mistake did not escape Tim's accountant who discovered it while helping Tim's attorney in preparing a counteroffer. He brought it to the attention of the attorney who, in his own words, reacted as follows:

"I told him that I had been arguing with [the wife's attorney] to use the value that was on the—on the real property tax statement, but I knew that that was low and [he] would never go for it, that the appraisal had been $425,000.00 when the building had been purchased by said owners, and I thought that until we got it, that we would use something like a $450,000.00 value, and he said, 'Fine.' It is my recollection that I said to him, 'You know, you might as well use the figure that Walker has there because his mistake is a hundred thousand dollars and we value it at a hundred thousand dollars less, so it is basically the same thing, so give it a $70,000.00 equity,' and that is what he did and that is how it came about."

A counteroffer was then submitted to Joan and her lawyer. It lists all of the community assets, with the property in question being valued at $70,082.00, rounding up the erroneous figure in Joan's offer to the nearest dollar. There can be no reasonable doubt that the counteroffer was prepared in a way designed to minimize the danger that Joan or her attorney would discover the mistake. While all other encumbered properties are listed at an agreed gross value, with encumbrances shown as a deduction therefrom, the only figure that appears next to the Holt property is the equity!

The counteroffer said nothing about attorneys' fees. One of its terms

---

[4]"888 East Holt Avenue, Pomona
(Note: value as per previous offer)

| | |
|---|---|
| Total value ........................ | $550,000.00 |
| Less encumbrance .............. | −308,362.99 |
| Net value ............... | $141,637.01 |
| One-half community .......................... $70,081.85" | |

was that Joan would assume a note of not quite $11,000. It was based on only 7,500 shares of the family corporation's stock being community property and a valuation at book. In other words, it represented a demand for total surrender by Joan on the two major items in dispute.

Based on the figures in the counteroffer Tim would have received substantially more in assets than Joan. This difference was to be made up by a cash payment of $46,534.

On February 16, 1968, the parties and their attorneys had a settlement conference. The counteroffer was the basis for the discussion. There was no mention that the figure of $70,082 for the equity in the Holt property was based on an agreed value of $550,000 or any other figure. In the discussion it was agreed that the husband was to assume the liability on the $11,000 note and was to pay Joan's attorney $7,500, a figure somewhat smaller than counsel's time charges up till then. The result of all this give and take was that the cash payment from Tim to Joan was to be reduced to $40,000.

A few days later a formal agreement was signed. It simply recites who was to get what, without ascribing any value to any of the properties. It also provides for the $40,000 cash payment. Sometime in March 1968, Joan obtained a divorce.

The mistake might never have come to light had not Tim desired to have that exquisite last word. A few days after Joan had obtained the divorce he mailed her a copy of the offer which contained the errant computation. On top of the page he wrote with evident satisfaction: "PLEASE NOTE $100,000.00 MISTAKE IN YOUR FIGURES. . . ." The present action was filed exactly one month later.

Tim testified that he did not learn of the arithmetical error until after the property settlement agreement was signed. The record contains no evidence to the contrary.[5]

## DISCUSSION

■ There is really no substantial conflict in the evidence and it is hard to understand how the trial court could do anything but grant Joan's prayer for relief.

Section 3399 of the Civil Code provides: "When, through fraud or a mutual mistake of the parties, *or a mistake of one party, which the other*

---

[5]We mention this only for the sake of completeness. There is no contention that Tim is not bound by his attorney's knowledge and actions.

*at the time knew or suspected,* a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." (Italics added.)

Clearly there was a mistake, Joan and her attorney thinking that a $550,000 value resulted in a community equity of about $70,000. The mistake was known to Tim's former attorney who swept it under the rug in the counteroffer by setting forth just the equity, instead of the value minus encumbrances, as he did with respect to other properties. True, he apparently justified this to himself morally by the fact that the value which Tim had been claiming all along resulted in a $70,000 equity, but he never drew the other side's attention to the fact that the counteroffer was based on Tim's previous position on the value of the Holt property. Joan and her attorney were, of course, quite satisfied in believing that Tim had surrendered his point on Holt since she was to abandon her position with respect to the ownership of 13,000 shares and the method of valuing of the entire block of 20,500 shares. Inasmuch as the error was discovered by Tim's attorney, it is, of course, no defense that it was negligently made by Joan's attorney. (*Voge, Inc.* v. *Rose,* 205 Cal.App.2d 534, 539-540 [23 Cal.Rptr. 87].) Nor was the defense based on any such theory. Rather what the defense proceeded to do was to isolate the problem of the correct valuation of the Holt property from all others that were on the table during the final settlement negotiations, by offering proof that it was worth no more than an amount which would result in the $70,000 equity. The trial court clearly went along with this approach, permitted Tim to prove the value of the Holt property by expert testimony and other means, found that the property was worth no more than $425,000, that Joan had received an equitable division of the community property "and that no reformation is required for said reason."[6]

Joan's counsel at all times resisted this compartmentalization of the issues that divided the parties before the property settlement agreement was signed. He was, of course, quite correct. If it is the law that reformation in this case can only be had if the trial court felt that the division of community property was fair, how could it possibly make such a finding based only on the value of the Holt property? As noted, Joan's extremely tenable position with respect to the stock would, if sustained, have been worth about $40,000, while the fight over the Holt property meant only $25,000. How did the trial court take into account the fact that Joan waived ali-

---

[6]Interestingly, the court made no finding with respect to Joan's pre-settlement contentions concerning the stock.

mony?[7] What the court did, in effect, was to retry just one of the many issues that could have arisen in a litigated divorce, to find that she would not have prevailed on that issue and to conclude from that that the entire property settlement agreement was fair.

This approach was wholly wrong. It ignores that the parties had settled their claims, thereby giving up any right to have a court determine them. That goes for Tim, as well as for Joan. The only legitimate question which was before the trial court was whether the settlement agreement should be reformed to express Joan's intent which was known to Tim who also knew, through his attorney, that the instrument did not express it.

Counsel for Tim argues, as defendants in these cases usually do, that Tim never intended to enter into a settlement based on the $550,000 figure and that a court of equity cannot make a new contract for the parties, whether a mistake is unilateral or bilateral. (*Lemoge Electric* v. *County of San Mateo,* 46 Cal.2d 659, 663-664 [297 P.2d 638].) The law is, however, more subtle, in that it estops the party who knows of the plaintiff's mistake from claiming that his intent differs from what he leads the other to believe it is. In *Eagle Indem. Co.* v. *Industrial Acc. Com.,* 92 Cal.App.2d 222 [206 P.2d 877], an insurer knew that a certain policy did not provide for certain coverage, and that the insured thought it did. It was held that the policy was subject to reformation according to the insured's intent. "Petitioner argues that the commission by ordering reformation of the policy created a new contract for the parties. Of course, reformation cannot be ordered so as to create a new and different contract for the parties (22 Cal. Jur. 710) but where, as here, the case falls within the language of Civil Code, section 3399, '[w]hen, through . . . a mistake of one party, which the other . . . knew or suspected, a written contract does not truly express the intention of the parties . . .' *the contract which was intended by the party acting under unilateral mistake known or suspected by the other, is, as a matter of law, the contract of the parties. . . .*" (*Eagle Indem. Co.* v. *Industrial Acc. Com.,* 92 Cal.App.2d at p. 229. Italics added. See also *Wilson* v. *Moriarty,* 88 Cal. 207, 212-213 [26 P. 85]; *Cleghorn* v. *Zumwalt,* 83 Cal. 155, 158 [23 P. 294]; *Baines* v. *Zuieback,* 84 Cal.App.2d 483, 489-490 [191 P.2d 67]; *Jones* v. *Universal Pictures Co.,* 45 Cal.App. 2d 748, 753-755 [114 P.2d 723].) Indeed, in view of the express wording of section 3399 of the Civil Code any other rule would thwart the legislative intent.

The rule that the party who misleads another is estopped from claiming that the contract is anything but what the other is led to believe, appears to

---

[7]Admittedly alimony probably was not much of a problem. Joan remarried soon after the divorce.

be quite generally accepted. Citing many cases from other jurisdictions and noting no contrary authority Corbin says: "Reformation may be a proper remedy even though the mistake is not mutual. If one of the parties mistakenly believes that the writing is a correct integration of that to which he had expressed his assent and the other party knows that it is not, reformation may be decreed. The conduct of the other party in permitting the first to execute the erroneous writing and later attempting to enforce it may be regarded as fraudulent; but it is enough to justify reformation that he knows the terms proposed by the first party and the meaning thereof and leads that party reasonably to believe that he too assents to those terms. This makes a contract; and the writing may be reformed to accord with it. The fact that the first party was negligent in failing to observe that the writing does not express what he has assented to does not deprive him of this remedy. The ground for estoppel is against the other and non-mistaken party, not against the mistaken party even though he is negligent." (3 Corbin on Contracts, § 614, pp. 730-732.) The rule is also in accord with the Restatement of Contracts.[8]

Therefore the fact, stressed over and over again by defendant, that he never affirmatively assented to a $550,000 valuation, is quite immaterial.

The trial court made a number of detailed findings, some of which are quite evidentiary and argumentative, which are attacked as being without support in the evidence. There is no need to discuss all of them, since several only relate to the basic misconception that Tim's lack of affirmative assent to the higher value vitiates Joan's right to reformation. We only discuss those which, if founded on evidence, might support the judgment.

The court found four different times that plaintiff knew that the counteroffer was not based on the $550,000 value. There just is nothing in the record to support that finding. Even if we attach no sinister significance to the fact that the counteroffer did not set forth the value on which the $70,000 equity depended and on the fact that no value was mentioned during the negotiations of February 16, 1968, we are still left with a plain-

---

[8]The rule is stated in section 505 of the Restatement. In comment (a) it is said: ". . . Reformation where it is available for mutual mistake precludes a power of avoidance of the contract. On the other hand, where a reformation is based on mistake of one party and fraud of the other the defrauded party has also as an alternative the power of avoidance." In 42 Cal.Jur.2d, Reformation, section 31, the authors cite the Restatement comment for the proposition that "knowledge or reason on the part of one party to suspect that the other's intention is something different from that which the writing expresses affords ground for reformation, but not for avoidance." No cases are cited to support this startling announcement which rests, of course, on a misreading of the Restatement.

tiff who mistakenly believed that her valuation had been accepted and a defendant who knew of that belief.[9]

The court found that Joan would have entered into the property settlement agreement if she had not obtained the acceptance of the $550,000 valuation. This, of course, is a far cry from finding that she would have settled if she had known that the settlement was based on $450,000. In any event there is nothing whatever in the record to support the finding. Tim argues that the finding is justified by Joan's knowledge he would not accept her $550,000 figure. As we have shown that finding is not supported in the evidence. The finding is thus based solely on conjecture. Settlement negotiations of the kind that were had between the parties are usually nothing but a high stake game of poker. Since it appears that each was holding the cards close to the vest, it does not appear possible to determine judicially who was bluffing. Finally we have found no case which indicates that it matters what Joan would have done had Tim been more frank. By permitting her to enter into the contract in the belief that he had accepted her $550,000 value, he simply took the risk that if she discovered the mistake and sought judicial redress, the contract would be enforced on the terms which she mistakenly thought she had already received.

The court found that Tim did not conceal any item of community property and that he disclosed the "nature, description and value" of all the items. What Tim concealed, however, was his discovery of the error or errors, which concealment, or to put it more charitably, which lack of disclosure is the nub of this litigation.

The case was fully tried and, as we said at the outset of our discussion, the record supports nothing but a judgment for the plaintiff as prayed.

The judgment is reversed with directions to make findings and conclusions and to enter a judgment in conformity with this opinion.

Stephens, J., and Aiso, J., concurred.

---

[9]Above we suggested that Tim's attorney possibly justified his actions morally by the fact that the figure in the counteroffer was based on, as he put it, "something like a $450,000 value." Actually the offer was not based on such a value but on, to be precise, a value of $448,526.99. If Tim's attorney also spotted the mistake which Joan's attorney made when dividing $141,637.01 by 2 and coming up with $70,081.85, it becomes rather obvious that he was not making an offer based on $450,000, but rather thought to lull Joan by repeating the mathematical error. In fairness, however, it should be noted that the evidence is susceptible of the interpretation that the attorney knew of the $100,000 mistake, but not of the other. It seems unlikely, however, that the latter escaped the attention of the accountant.