Filed 2/16/23  Marriage of Riccardi CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

|  |  |
|---|---|
| In re the Marriage of VALERIE and MARK ANTHONY RICCARDI. | B317828 |
| VALERIE RICCARDI, Appellant, v. MARK ANTHONY RICCARDI, Respondent. | Los Angeles County Super. Ct. No. BD632307 |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Armando Durón, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Reversed in part.

Ferguson Case Orr Paterson, Wendy C. Lascher and Jessica A. Barajas for Appellant.

The Appellate Law Firm and Aaron Myers for Respondent.

———————————————

Mark Anthony and Valerie Riccardi were married in 2002. Four years into their marriage, they bought a house in Santa Clarita. It is undisputed that the house was community property pursuant to section 760 of the Family Code.[1] Mark and Valerie separated in July 2017. Valerie filed for divorce, and after a court trial, the court entered a judgment of dissolution on October 27, 2021.

Valerie challenges only one aspect of the judgment in this appeal: the trial court's decision to reimburse Mark, pursuant to section 2640, subdivision (b), $50,000 from the down payment the couple made on the Santa Clarita house. The basis for this award was oral testimony from both Mark and Valerie that proceeds from Mark's sale of another house in Calabasas—one that he owned before marriage—were used to fund the down payment. Valerie asserts that the testimony was inadequate to support the award. We agree and reverse that part of the judgment ordering reimbursement of $50,000 to Mark.

## BACKGROUND

Mark and Valerie married in 2002. At the time of their marriage, Mark owned the Calabasas house.

Four years after their marriage, Mark sold the Calabasas house. This sale generated net proceeds of "[r]oughly about [$]80,000."

Mark testified that the approximately $80,000 in proceeds from the Calabasas house sale were deposited "[i]nto a personal account." When asked what bank maintained the account, he responded: "I'd have to say Bank of America." How else this "personal" Bank of America account was used is not the subject of

---

[1] Undesignated statutory references are to the Family Code.

any express findings by the trial court and not clearly disclosed in the record.

About five months after Mark sold the Calabasas house, Mark and Valerie bought the Santa Clarita house. They agree that some of the money for the down payment on the Santa Clarita house came from proceeds of the Calabasas house. However, as discussed further below, they offer no clarity on the amount.

Mark and Valerie separated in July 2017. They sold the Santa Clarita house in February 2018. They split the proceeds equally, each receiving about $22,000.

Their marital dissolution case proceeded to trial in July 2021. At trial Mark made a claim for reimbursement, pursuant to section 2640, subdivision (b), for the value of his separate property contribution to the down payment on the Santa Clarita house. As Mark describes it in his appellate brief, he "claimed $60–80,000 in separate property from the proceeds of his [pre]-marital home used to purchase the marital home." The rather broad range of this indefinite request reflects the uncertainty and vagueness of Mark's testimony in support of the claim.

On direct examination, Mark testified that the down payment was "[$]80,000." Initially, he said that this amount came from the sale of the Calabasas house. He then added that the money was from the Calabasas sale "[a]long with like $20,000." On cross-examination, he testified he "[could]n't be certain" how much the down payment was. When asked if it was more or less than $80,000, he responded "[i]t could have been less." Whatever the amount was, he "guess[ed]" that he funded the down payment by "writ[ing] a check from Bank of America," but then said the payment might have been made by "[c]ashier's check or could have been wired." Mark conceded that "[n]o," he

did not "have the tracing to trace the money out of Calabasas, holding into an account for five months, and then it going out into the Santa Clarita escrow."

Valerie's testimony about the down payment was even more uncertain. When asked where the down payment came from, she replied that "[p]art of it was a loan, I think. And then the other of it were moneys from the sale of [the Calabasas] house, I believe." This exchange between Mark's counsel and Valerie followed:

"Q     And do you recall that, in fact, the money that came from the [Calabasas] house was $50,000?

"A     I'm not sure.

"Q     Or any other number? Do you have any idea what that number was?

"A     No, I'm not sure.

"Q     When you say you're not sure, does that mean 'I don't know,' or does that mean it could be this or that.

"A     It means I don't know."

The trial court requested supplemental briefing on Mark's claim for reimbursement, and the parties complied. It decided the issue by minute order dated August 20, 2021. In the minute order, the court noted that Mark had "provided no records to corroborate" his request but that Valerie had acknowledged he "contributed some funds from the sale of his separate property home . . . ." The court called Valerie's claimed inability to remember the amount "not credible" in light of her contrasting confidence on other topics and "evasive demeanor" when questioned about Mark's contribution. Finding the evidence " 'sufficiently established' " the separate property portion used for the down payment was $50,000, and summoning its equitable powers, the court awarded Mark a separate property

4

reimbursement of $50,000.  (Quoting *In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1059 (*Cochran*).)

Judgment was entered on October 27, 2021.

At no point did anyone object that the ordered reimbursement exceeded the proceeds from the 2018 sale of the Santa Clarita property or address that Mark and Valerie had each already received half the proceeds of the sale before Mark made his claim for reimbursement.

## GOVERNING LAW AND STANDARD OF REVIEW

Section 2640, subdivision (b) allows a spouse to be reimbursed for "contributions to the acquisition of property of the community property estate to the extent [such spouse] traces the contributions to a separate property source."  (*Ibid*.)  The amount that may be reimbursed is limited to the "net value of the property at the time of the division."  (*Ibid*.)

The spouse seeking reimbursement under section 2640 has the burden of proving the money contributed to acquire community property came from a separate property source.  (*In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 441.)  Whether the spouse seeking reimbursement of a contribution of separate property to a community asset "has adequately [met his or her burden of tracing] an asset to a separate property source is a question of fact and the trial court's holding on the matter must be upheld if supported by substantial evidence."  (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 823 (*Braud*).)  Substantial evidence is that which " ' " 'a reasonable mind might accept as adequate to support a conclusion.' " ' "  (*Ogundare v. Department of Industrial Relations* (2013) 214 Cal.App.4th 822, 830.)

5

## ANALYSIS

**1.  Mark's Tracing Burden Included the Burden to Show that the Calabasas Sale Proceeds Were Traceable and Identifiable in the Bank of America Account. Mark Offered No Substantial Evidence to Satisfy that Burden.**

Mark testified that the proceeds from the sale of the Calabasas house passed through the "personal" Bank of America checking account before funding the down payment on the Santa Clarita house.  Valerie characterizes the Bank of America account as "commingled."  Valerie points to testimony that her income during the marriage was deposited into Mark's business, Take Two Entertainment, Inc., and there is evidence in the record that Take Two had a Bank of America account.  She notes that "[t]here is no testimony that Take Two maintained a business account separate from Mark's personal account into which Valerie's income was comingled."  Relying on *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 95–96 (*Ciprari*) and *In re Marriage of McLain* (2017) 7 Cal.App.5th 262, 273–274 (*McLain*), Valerie asserts Mark failed to satisfy his tracing burden as a matter of law because tracing through a commingled account requires documentary evidence and he offered none.

Mark responds that the trial court made no finding that the Bank of America account was commingled and, without record citation, that Take Two had its own business bank account.  Mark refers to the Bank of America account that held the Calabasas proceeds in briefing as a "separate" account and claims there was no evidence of commingling in that account.  He argues his testimony about Calabasas proceeds going in and money for the Santa Clarita down payment coming out was sufficient to satisfy his tracing burden.

6

Mark is correct that the trial court made no express finding that the Bank of America account was commingled. However, he fails to provide a record citation for his assertion that the Bank of America account was "separate." Mark only called it "a personal account," which he distinguishes in briefing from a "business account." His testimony it was "a personal account" is not substantial evidence the Bank of America account contained only Mark's separate funds to the exclusion of any community funds. As far as we have been shown, there is simply no substantial evidence that the Bank of America account was separate. On the other hand, the record does not compel a finding as a matter of law that it was commingled. The question thus becomes whether Mark can satisfy his tracing burden under section 2640 simply by asserting he deposited money into a bank account held during the marriage and withdrew a similar quantity of money months later to fund the purchase of a community asset.

Valerie asserts that the answer is "no" because section 760 creates a presumption that property acquired after marriage is community property. We disagree that the record supports application of that presumption here. There is no evidence of when the Bank of America account was opened. If Mark owned the Bank of America account prior to marriage and never commingled community funds in it, it would remain Mark's separate property. (*In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 850 ["in California, property acquired prior to marriage is separate"].)

But we agree with Valerie that Mark's burden to trace under section 2640 called on him to introduce more information about the Bank of America account than the record contains. If the Bank of America account was commingled, as Valerie's testimony about the Take Two account suggests it may have

7

been, the separate property funds deposited would become community property to the extent that the separate property funds were not traceable and identifiable. (*Braud, supra*, 45 Cal.App.4th at pp. 822–823.) Thus, to trace the funds through the Bank of America account, Mark had to show that either (a) there was no commingling at all—i.e., that the account contained only Mark's separate property; or (b) that even though it was commingled he could adequately trace his separate property to the down payment funds. (*Id.* at p. 822 [husband bore burden to trace through commingled checking account that was immediate source of funds even in absence of dispute that he deposited separate funds into that account].) He did not show either.

As Mark correctly notes, tracing of funds does not necessarily require documentary evidence in every case. In *In re Marriage of Ficke* (2013) 217 Cal.App.4th 10, tracing through a bank account did not require documentary evidence where the husband testified that the bank account was a separate, non-commingled account. (*Id*. at pp. 26–27.) Here, Mark did not testify that the Bank of America account was separate (as we said before, "personal" does not mean "separate" under the law), and not commingled. And Valerie's testimony suggested it may have been commingled. If the account *was* commingled, Mark had to introduce documentary evidence to show that the Calabasas proceeds remained traceable through the Bank of America account. (*McLain, supra*, 7 Cal.App.5th at pp. 273–274.)

Without evidence either that the Bank of America account was separate (oral or documentary) or the Calabasas proceeds were traceable through the account (documentary), the trial court made an unfounded assumption that one or the other of these facts was true. "While substantial evidence may consist of

8

inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding . . . ." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)

This case is unlike *Cochran, supra*, 87 Cal.App.4th 1050, relied upon by the trial court. The *Cochran* court excused the absence of documentary tracing evidence where the husband seeking reimbursement offered stipulations sufficient to trace the separate and community funds in a bank account. He and the wife stipulated to a starting balance in a bank account ($77,395) and the portions of that starting balance attributable to separate ($43,061) and community ($34,406) property. (*Id.* at p. 1055.) A single draw ($34,192) to satisfy a community debt consumed all but $213 of the community portion. (*Id.* at p. 1058.) With proof that only $213 in community funds remained before payments were made to build the family home, the court reversed the trial court's determination that husband failed to adequately trace subsequent draws to the community asset. The court explained, "[i]t can be presumed under the family expense presumption that the remaining $213 in community property funds was used first to pay for the subsequent home construction loan earnest money since the loan was for building the family home, a community asset. Then, by process of elimination (there being no community property funds left in the bank account), we conclude that husband's remaining separate property funds were used for the remainder of the $32,950 payment." (*Id.* at pp. 1058–1059.)

No such evidence was provided in this case. There was no evidence of the starting balance in the Bank of America account. There was no evidence of transactions (deposits, withdrawals, or

9

no activity at all) in the account during the five months that some or all of the Calabasas money remained on deposit.

Finally, we acknowledge Mark's discussion of *Ciprari*, *supra*, 32 Cal.App.5th 83, which provides that parties have flexibility in what methods they may use to trace funds and the type of evidence that may be considered to do so. (*Id*. at pp. 96–97.) Mark concludes that this flexibility permitted the trial court to make the award it did based on his limited testimony. Flexibility of proof is one thing; a failure of any evidence at all to show that separate funds were traceable through the Bank of America account is quite another. *Ciprari* does not authorize a court to excuse the reimbursement claimant of his or her burden to trace to identifiably separate property.

2. **Mark Also Failed to Trace Because There Is No Substantial Evidence of the Amount of Calabasas Sale Proceeds Used to Purchase the Santa Clarita House.**

The evidence was insufficient to support a finding that Mark satisfied his tracing burden for an additional reason. As Mark acknowledges, he testified "that he used proceeds from the sale of [the Calabasas house] as the down payment for [the Santa Clarita House]. [Citation.] The question left open was not *that* he did so, but the amount of the proceeds used." This concession independently establishes a lack of substantial evidence that he adequately traced the funds.

Mark's testimony failed to establish with any certainty either the amount of the Santa Clarita down payment or the amount of Calabasas proceeds used to make it. He first said the down payment was $80,000, and it came from "[t]he proceeds from the Calabasas home." But he immediately clarified that it was Calabasas proceeds "[a]long with like $20,000." He later

10

conceded he could not be certain how much the down payment was at all, allowing that it "could have been less" than $80,000. His cross-examination ended with the admission that he did not "have the tracing to trace the money out of Calabasas . . . ."

Although what it means to "trace" for purposes of section 2640 is not explicated in the statute, courts have held that it requires more clarity than Mark's testimony provided. In *McLain, supra,* 7 Cal.App.5th 262, the parties agreed, as they do here, that *some* amount of money from the sale of the husband's separate property house was used to build a community property house. The court found that such evidence did "not provide substantial evidence for tracing Husband's separate property because it is *unclear what amount* of money from the sale of the [separate property house] was used to pay for construction." (*Id.* at pp. 274–275, italics added.) Similarly, in *Braud, supra,* 45 Cal.App.4th 797, the wife's admission that "some payments were made" from a commingled account for improvements to the family home was inadequate to support the husband's reimbursement claim because there was no proof of the amounts expended on the improvements nor any other evidence about funds going into or out of the account. (*Id.* at p. 824.)

We have been cited no cases, and encountered none in our own research, where tracing was accomplished through such rough estimates, qualified by as much uncertainty, as offered here. There is simply no evidentiary support for the $50,000 reimbursement the trial court ordered. The only appearance of that number we are cited to in the record was in a *question* posed to Valerie by Mark's *lawyer*: "[D]o you recall that, in fact, the money that came from the [Calabasas] house was $50,000?" Valerie's response: "I'm not sure."

11

Even though the trial court doubted Valerie's sincerity on this point, it does not establish a number. Disbelief of testimony "does not constitute affirmative evidence of the contrary proposition." (*Viner v. Sweet* (2004) 117 Cal.App.4th 1218, 1229.) Rather, "disbelief of affirmative evidence . . . is the equivalent of no evidence at all," and therefore, in the absence of other evidence, "requires entry of a judgment against the party with the burden of proof on that issue . . . ." (*Id.* at p. 1231.) Had Mark met his burden to adequately trace, the trial court would not have needed to rely on a non-answer to a lawyer's question to establish the amount of his contribution.

3. **The Trial Court's Equitable Powers Did Not Authorize It to Award Mark Reimbursement.**

Although family courts are courts of equity (*In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28, 38), equity "may not be used to find liability where the result would nullify a contrary statute" (*Tuthill v. City of San Buenaventura* (2014) 223 Cal.App.4th 1081, 1088). Section 2640, subdivision (b) permits reimbursement only to the extent the party seeking reimbursement "traces the contributions to a separate property source." The trial court's resort to equity cannot justify its award of $50,000 in reimbursement to Mark where he failed to adequately trace.

Moreover, though neither party raised the issue, we note that the trial court's award violated section 2640 in another manner—it reimbursed Mark an amount more than the "net value" of the Santa Clarita house at the time of division. Section 2640, subdivision (b) provides that "[t]he amount reimbursed . . . may not exceed the net value of the property at the time of the division." The "net value" refers to the community estate's equity in the property. (See *Stare v. Tate* (1971)

12

21 Cal.App.3d 432, 435 ["equity" or "net value" calculated as gross value less encumbrances].)

At the time of division, i.e., the judgment date, the Santa Clarita house had already been sold. The actual, realized net proceeds were only approximately $44,000. Of this amount, Mark already received $22,000. The trial court's judgment that "[t]he amount of the [section] 2640 reimbursement [Mark] is entitled to from [Valerie] amounts to $50,000" is manifestly contrary to section 2640. It would provide Mark a total of $72,000 on account of the Santa Clarita house—nearly $30,000 more than the value of the community's equity in it. The award was not a proper exercise of the court's equitable powers for this reason as well.

## DISPOSITION

The judgment is reversed to the extent of the award to Mark of $50,000 for reimbursement on account of his claimed contribution of separate property to the purchase of the Santa Clarita house. Valerie is to recover her costs on appeal.


GRIMES, Acting P. J.

WE CONCUR:


WILEY, J.


VIRAMONTES, J.

13